## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

FIDELITY NATIONAL TITLE     )
INSURANCE COMPANY, SUCCESSOR    )
BY-MERGER TO LAWYERS TITLE    )
INSURANCE CORPORATION,    )
               )    Case No. 4:10-cv-01890-CEJ
     Plaintiff,    )
               )
vs.             )
               )
CAPTIVA LAKE INVESTMENTS, L.L.C.,  )
               )
     Defendant.    )

## DEFENDANT CAPTIVA'S MOTION FOR SANCTIONS

COMES NOW Defendant, Captiva Lake Investments, L.L.C. ("Captiva"), by and through its undersigned counsel, and pursuant to Rule 37, sections (c)(1) and (b)(2)(A) of the Federal Rules of Civil of Procedure,[1] moves the Court to impose sanctions against Plaintiff Fidelity National Title Insurance Company, successor by merger to Lawyers Title Insurance Corporation ("Fidelity"), on the grounds that Captiva has incurred grave prejudice as a result of Fidelity's violation of its disclosure obligations under the discovery rules and Fidelity's violation of the Court's Order to provide Captiva with requested information. Fidelity's violations stem from a dilatory objective. Fidelity has accomplished its dilatory objective by failing to produce information to Captiva in any semblance of a timely fashion and, even more egregiously, Fidelity has concealed and suppressed (and continues to suppress) the existence of important information. In defiance of the Court's Order of August 17, 2012, Fidelity has yet to provide critical portions of the claims file—originally requested over a year and a half ago. Because central witnesses have already been deposed and trial preparations are

---

[1] The relief that Captiva seeks is also justified by the Court's inherent power to impose sanctions. *See Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

in full swing, Captiva has incurred and continues to incur prejudice that is directly attributable to Fidelity's delays and Fidelity's blatant disregard for its discovery obligations and this Court's authority.  Sanctions are now warranted.   In support of its Motion, Captiva states as follows:

1.  Fidelity concealed the existence of two primary sources of critically important information.  As explained more fully below, Fidelity concealed the existence of its vast Claims Processing Systems ("CPS") and a compendium of reports known as Major Claims Reports, despite Captiva's clear requests for this information in May 2011.  Neither source of information could have been easily overlooked by Fidelity because both are (and have been) regularly updated.  Willful concealment is the only reasonable explanation.

2.  Serendipitously (as explained more fully below), Captiva only recently learned of Fidelity's CPS after discovering references to a "claims processing system" and "CPS" in Fidelity's Claims Handbook.  Captiva only obtained the Claims Handbook following an eleven-month delay during which Fidelity was, in response to Captiva's discovery request, purportedly locating and gathering information pertaining to its claim handling guidelines.   Fidelity's Claims Handbook is the company's seminal guide on handling claims and must have been readily available and capable of being immediately produced to Captiva upon request.  Yet, Fidelity waited for nearly a year before producing it, thereby delaying Captiva's discovery of Fidelity's CPS (which Fidelity should have disclosed as a matter of course).

3.  Similarly (as explained more fully below), Captiva learned of the existence of Fidelity's Major Claims Reports on May 23, 2012—over a full year after Captiva requested information related to the handling of Captiva's claim—during the deposition of the last fact witness noticed by Captiva (Fidelity's former claims administrator, Mark Dickhute, who testified that he generated Major Claims Reports on a monthly basis).  Despite the ongoing and regular

generation of Major Claims Reports, Fidelity never disclosed the existence of these regularly-generated reports.

4.    Immediately upon learning of the existence of CPS and Major Claims Reports, Captiva demanded that Fidelity produce its CPS information and Major Claims Reports.

5.    Fidelity refused, forcing Captiva to file a motion to compel (Dkt. 91).    In response, Fidelity represented to the Court that information from both sources was privileged, despite the fact that Fidelity had never disclosed the existence of CPS and Major Claims Reports in Fidelity's privilege log.

6.    On July 9, 2012, the Court entertained Fidelity's request for an *in camera* review of its non-disclosed "privileged" materials, and the Court ordered Fidelity to deliver "its [CPS] file and all Major Claims Reports created for [Captiva's] claim" to the Court for inspection. Order (Dkt. 106).

7.    In response, Fidelity handed over two thousand pages of the Major Claims Reports—many pages of which did not, contrary to the Court's Order, relate to "defendant's claim".  Fidelity also provided the Court with CPS "screen prints" (as opposed to printed reports) because, as Fidelity represented to the Court, "there is no hard file to be produced", inferring that printed reports did not exist and printing reports was not an option (neither is likely true).[2]  *See* Correspondence from S. Briner to the Court, July 12, 2012, attached hereto as **Exhibit 1** and incorporated by reference, at 1.  As Captiva later learned (and as will be explained more fully below), Fidelity had selectively chosen which CPS materials to produce to the Court in order to purposefully facilitate further future delays.  Fidelity had been ordered to produce all Major

---

[2] As the Court would later note, the "screen prints" produced by Fidelity deprived the viewer of certain information such "author and date of entries".  Order (Dkt. 113), at 2.

Claims Reports and CPS data relating to Captiva's claim. Fidelity did not do so, constituting its first (of four) violations of the Court's orders.

8.      On July 23, 2012, the Court responded to the two thousand pages of Major Claims Reports dumped on it by Fidelity and reiterated its previous order to Fidelity to produce "'all Major Claims Reports created for [Captiva's] claim.'" Order (Dkt. 111). On July 31, 2012, Fidelity purported to comply. However, as Captiva learned later (and as will be explained more fully below), Fidelity had not produced "all" of the Major Claims Reports ordered by the Court but had omitted months-worth of reports. This constitutes Fidelity's second violation of the Court's orders.

9.      On August 17, 2012, the Court overruled Fidelity's objection that the information sought by Captiva was privileged, granted Captiva's motion to compel, and ordered Fidelity to produce all Major Claims Reports and information contained in CPS. *See* Order (Dkt. 113), at 6-7.

10.      On September 4, 2012, Fidelity purported to comply with the Court's Order and served Captiva with additional documents.

11.      However, the documentation Fidelity provided to Captiva did not comply with the Court's Order and was noticeably deficient. Primary information was only provided for some CPS fields (none on one entire claim), and months of Major Claims Reports were missing. This constitutes Fidelity's third violation of the Court's orders.

12.      Captiva immediately expressed its incredulousness to Fidelity but, in the spirit of good faith, afforded Fidelity yet another opportunity to remedy its deficiencies before Captiva would look to the Court for relief. *See* Correspondence from R. Wunderlich to S. Briner, Sept. 7, 2012, attached hereto as **<u>Exhibit 2</u>** and incorporated by reference.

13. In response, Fidelity stated it was having to "track down" the missing information and needed to consult with "e-discovery specialists [in order] to figure out what else can be done" to produce the very information that it had originally been ordered to provide to the Court on July 9, 2012 and that Captiva had requested nearly sixteen months earlier. *See* E-mail correspondence from S. Briner to S. Hall, Sept. 12, 2012, attached hereto as **Exhibit 3** and incorporated by reference; Order (Dkt. 106).

14. Captiva informed Fidelity that this was "not satisfactory" and that "[t]here was no excuse for [Fidelity] not to have fully complied with the Court's order, especially since the disclosure should have been made over a year ago." *See* E-mail correspondence from R. Wunderlich to S. Briner, Sept. 12, 2012, attached hereto as **Exhibit 4** and incorporated by reference.

15. On September 14, 2012, Fidelity produced additional documents to Captiva but the information provided continued to be incomplete. Specifically, Fidelity claims that two months-worth of Major Claims Reports could not be located and purported to provide some "excerpts or drafts" to Captiva instead. *See* Correspondence from S. Briner to R. Wunderlich and S. Hall, Sept. 14, 2012, attached hereto as **Exhibit 5** and incorporated by reference, at 1, ¶ 2. With regard to other materials contained in the claim file (or information that was otherwise relevant), Fidelity stated that it was "still attempting to locate and retrieve" that information. *Id.* at 3, ¶ 13. This arguably constitutes Fidelity's fourth violation of the Court's orders.

16. With trial scheduled to commence in about a month, Captiva has been and is being prejudiced by the delays occasioned by Fidelity's concealment and suppression of information that Fidelity was (and is) obligated to disclose/produce under the rules *and* information that the Court has ordered Fidelity to produce. This gamesmanship employed by Fidelity, both past and present, constitutes sanctionable conduct, and Captiva now seeks such

sanctions to compensate it for the prejudice it has and continues to incur and to deter future misconduct.

*Background*

17.     Nearly a year and a half ago, on or about May 11, 2011, Captiva served its First Request for the Production of Documents on Plaintiff, which included requests for Plaintiff's "claims file for the Policy" and all information "related to any evaluation of coverage under the Policy."  *See* Captiva's First Request for the Production of Documents, previously provided to the Court as Exhibit 1 to its Motion to Compel, filed on Aug. 8, 2012, available at Dkt. 91-1, Req. Nos. 12 and 15.

18.     As the Court may recall from the parties' briefing on Captiva's motion to compel (Dkt. 91), Fidelity did not produce all of the requested information but professed to be making an effort to gather the requested information and objected to producing some portions of the information requested by Captiva on the basis of privilege and confidentiality.  *See* Fidelity's Answers and Objections to Captiva's First Request for the Production, previously provided to the Court as Exhibit 2 to its Motion to Compel, filed on Aug. 8, 2012, available at Dkt. 91-2, Req. Nos. 12 and 15.

19.     Fidelity provided Captiva with a privilege log.  In relevant part, Fidelity identified ten pages of privileged documents as "Status Reports" (a disclosure that Fidelity would later contend apprised Captiva of Fidelity's Claims Processing System) and did not disclose the existence of the Major Claims Reports (months later and only *after* Captiva fortuitously discovered the existence of the reports during the deposition of Mark Dickhute, Fidelity updated its privilege log and asserted that the Major Claims Reports were privileged).  *See* Order (Dkt. 113), at 2.

20.     With the deposition of Fidelity's Rule 30(b)(6) designee on claims issues (Ms. Corlis Chevalier) and Fidelity's key employee who handled Captiva's claim under the Policy (Mr. Mark Dickhute) only days away, Fidelity still had not produced the claims handling guidelines that would be needed to conduct a meaningful deposition of Mr. Dickhute and Ms. Chevalier, and Captiva informed Fidelity that it could wait no longer and would have to seek relief from the Court.

21.     In response, Fidelity informed Captiva that the claims handling guidelines (the Claims Handbook) had finally been located, however Fidelity refused to produce the Claims Handbook absent a comprehensive protective order.  After Defendant threatened to file a motion to compel, the parties were able to reach agreement as to the terms under which these materials would be produced, and Fidelity finally produced its Claims Handbook on or about April 19, 2012—nearly a year after Captiva requested it.

22.     Upon review of the Claims Handbook, Captiva began to piece together Fidelity's concealment of relevant information.  Specifically, Captiva's review of the Claims Handbook revealed references to Fidelity's Claims Processing System, and in subsequently asking Mr. Dickhute (the last fact witnesses that Captiva deposed) about Fidelity's claims system, Captiva learned for the first time about the highly-relevant Major Claims Reports.

23.     In clear violation of the discovery rules, neither the CPS materials nor the Major Claims Reports—despite the critical relevance to the claims at issue in this lawsuit and Captiva's clear and proper requests for such information—had ever been disclosed to Captiva by Fidelity. Captiva had to hunt down this information—an effort that was only successful due to Captiva's tenacity and a little luck.  However, meaningful discovery should not depend so heavily, as it has here, upon a party's tenacity and luck.  Fidelity should be sanctioned for prejudicing Captiva by

subjecting Captiva to Fidelity's concealment of relevant information and ongoing delays in producing information that should have been disclosed and produced months ago.

*CPS Materials*

24. None of Fidelity's disclosures, discovery responses or its privilege log make mention of a "claims processing system" or "CPS". As noted above, Captiva only learned of the existence of the CPS after nearly a year-long effort to obtain Fidelity's Claims Handbook. After Captiva learned of the CPS and Fidelity refused to produce the CPS materials, Captiva filed a motion to compel. In response, Fidelity took the position that it disclosed the CPS with a single entry in its privilege log, denoting ten pages of documents identified as "Status Reports". The Court rejected Fidelity's argument and granted Captiva's motion to compel, concluding that if any privilege did apply, Fidelity had waived it. Order (Dkt. 113), at 6-7.

25. As correspondence from Fidelity's counsel to the Court acknowledges, CPS materials relate to two specific claims with separate identifying numbers (no. 351475 and no. 372859). *See* Correspondence from S. Briner to the Court, July 31, 2012, attached hereto as **Exhibit 6** and incorporated herein by reference. However, after Fidelity was ordered to produce this information, Fidelity only provided some of the *actual* CPS data for one of the claims (no. 351475). For the other claim (no. 372859), Fidelity produced a spreadsheet into which Fidelity claims to have "extrapolate[ed]" the CPS information but did not produce any actual or primary documentation. Fidelity offered to provide the actual CPS documentation but dismissed the need for this actual information because it was "duplicative" of what Fidelity extrapolated and placed in the spreadsheet it produced. *See* E-mail correspondence from S. Briner to R. Wunderlich and S. Hall, Sept. 4, 2012, attached hereto as **Exhibit 7** and incorporated herein by reference. The discovery rules provide no basis for a producing party to satisfy its discovery obligations by picking and choosing information to extrapolate and produce.

8

26.     Because Captiva had reason to distrust the completeness of any extrapolation of CPS data by Fidelity, Captiva requested the actual CPS information. The "production" of CPS information for claim no. 372859 in the form of an extrapolated spreadsheet violated the Court's Order (ordering Fidelity to produce the CPS information—not extrapolations), but of greater practical significance, the effect of Fidelity's production of extrapolated information is further prejudicial delay further impairing Captiva's ability to prepare for trial. By tendering an extrapolation of data, what Fidelity accomplishes practically is the consumption of valuable time while Captiva is forced to wait while Fidelity purports to gather the actual information that the Court ordered it to produce. In sum, after Captiva inquired about information such as the CPS information in its May 2011 discovery requests to Fidelity, Fidelity for some time successfully withheld the CPS information from Captiva and prevented Captiva from learning of its existence. Then, by refusing to produce the CPS information after Captiva did discover it and forcing Captive to litigate a motion to compel, Fidelity successfully further delayed Captiva's access to this information (in addition to unjustly running up Captiva's expenses). Then, by not following the Court's Order to produce all CPS information but instead producing incomplete extrapolations of CPS data to Captiva, Fidelity succeeded yet again in delaying Captiva's access to the CPS data to whatever time in the future when Fidelity and its "e-discovery specialists" can locate the information that Captiva requested and the Court ordered it to compile on July 9, 2012. *See* Order (Dkt. 106). With trial set to begin on October 22, 2012, the prejudice to Captiva—as Fidelity continues to delay and conceal information—is glaringly obvious in that Captiva's ability to prepare for trial is unjustly impaired.

27.     As to the actual CPS information that Fidelity produced (that related to claim no. 351475), Fidelity's production was grossly deficient. According to the screenshots Fidelity produced, the CPS system contains approximately fourteen fields into which information is

entered. However, Fidelity did not provide Captiva with any information pertaining to many of these CPS fields. For other fields, such as the "Financial Details" field, some of the information Fidelity provided is incomplete because the printed screenshots cut off information.[3] *See, e.g.,* "Financial Details" screen shot, attached hereto as **Exhibit 10** and incorporated herein by reference, at FNT0009016-18. Fidelity offered no explanation as to the absence of this information. Captiva expressed its concern about being denied this information on September 7, 2012, and Fidelity responded that it was consulting "with e-discovery specialists to figure out what else can be done …", despite being put on notice no later than July 9, 2012 that this information would have to be gathered because the Court wanted to see it. *See* Briner/Hall e-mail (**Ex. 3**), at 1. On September 14, 2012, Fidelity finally informed Captiva that no data purportedly existed for the missing fields.

28. Yet, even in the CPS information Fidelity produced, Captiva has reason to suspect that information may be missing. For example, some CPS entries include the identity of the entrant, and there are multiple entries that identified Mark Dickhute as the entrant. However, Captiva's claim was initially handled by Lance Perna, and there are no discernible CPS entries by Mr. Perna despite his testimony that his responsibilities included activities that would be entered into CPS, including entry of his mental impressions regarding coverage. Deposition testimony of L. Perna, relevant excerpts of which are attached hereto as **Exhibit 9** and incorporated herein by reference, at 19-22, 42-43. As a result, Captiva has a reasonable basis to conclude that it is still being deprived of information to which it is entitled. Also, Captiva incurred further prejudice because it was deprived of the opportunity to question Mr. Perna

---

[3] As noted in the Court's Order of August 17th, the information provided to the Court (and what was subsequently produced to Captiva) contains no identification of the entrant's identity and when the entry was made. Order (Dkt. 113), at 2, n.2. Captiva has requested this data from Fidelity, and Fidelity's response was to assert that it is consulting with "e-discovery specialists to figure out what else can be done …" Briner/Hall e-mail (**Ex. 3**).

regarding entries during the period in which he was administrating the claim (or why no entries bear his name) because no CPS documents had been produced as of the date of his deposition.

29. As Fidelity represented to the Court, the purported justification for producing "screen prints" of CPS is "that CPS is an electronic database, [and] there is no hard file to be produced." Briner letter to Court (**Ex. 1**), at 1. This representation is inconsistent with the testimony of Fidelity's employees who administered the claims, information appearing in the Fidelity's own Claims Handbook, and Missouri insurance laws.

30. Lance Perna, whom Fidelity initially assigned to manage Captiva's claim, provided testimony regarding physical aspects of the file that betrays Fidelity's assertions that there is no physical file and Fidelity must engage "e-discovery specialists" to produce written reports as to the claims activity placed in the CPS. Perna Depo. (**Ex. 9**), at pp. 42-43; *see also id.* at pp. 18-24; p. 42, l. 25 – p. 43, l. 1 (Fidelity was able to provide "copies of the CPS documents" to Fidelity personnel).

31. Further, contrary to Fidelity's representations, information appearing in Fidelity's Claims Handbook infers the existence of CPS information in the form of a physical file. The Handbook directs that some information appearing in the CPS system "must be printed" and other information "can then be printed and saved for future use". Handbook, at 4-23, 4-11 (cited sections of the Handbook have not been attached to this Motion because the Handbook was produced to Captiva pursuant to a protective order and Captiva will provide these excerpts to the Court upon the granting of its pending motion for leave to file such under seal as **Exhibit 18**). The Handbook also states a function of the CPS is to provide information to "external auditors", which would necessitate printed reports. Handbook, at 4-1. Furthermore, the various screen shots of the CPS appearing in the Handbook are replete with references to print functions. *See, e.g.,* Handbook, at 13, 14, 17, 4-6, 4-15, 4-17, 4-19, 4-23, 4-29, 4-30.

32.    As a practical matter, Fidelity's production of "screen prints" (as opposed to physical paper reports) provides incomplete information because in printing the screens, information is cut off.  *See, e.g.,* "Financial Details" (**Ex. 10**) screenshot, at FNT0009016-18.  More delay occurred as a result of Fidelity's production of screenshots because Captiva had to request that Fidelity provide it with printed reports of the CPS information that the Court ordered Fidelity to produce, as opposed to incomplete screenshots.  The above cited exhibit (**Ex. 10**) shows the ease by which Fidelity could have printed reports instead of producing incomplete screenshots, because on the last page of Exhibit 10, a "Print Preview" button is visible.  *Id.* at FNT0009018.  Further, in correspondence with the Court, counsel acknowledged that "copies of status reports printed from CPS" were enclosed, which evidences the fact that incomplete screenshots need not have been produced because the production of complete printed reports was an option that Fidelity chose to ignore in instead facilitating delay through the production of incomplete screenshots.  *See* Briner/Court letter (**Ex. 1**), at 2.

33.    Finally, Fidelity's production of screenshots on the basis that "there is no hard file to be produced" is a premise that violates Missouri's insurance law.  Under that law, any insurer––domestic or foreign—that does business in Missouri must keep a hard file.

> Form of Record. Photographs, microfilms or other image-processing reproductions of records shall be equivalent to the originals and may be certified as same in actions or proceedings before the Department of Insurance unless inconsistent with 20 CSR 800-1.100.  However, the maintenance or records in a computer-based format shall be archival in nature only, so as to preclude the possibility of alteration of the contents of the record by computer after the initial transfer of the record to this format.  In addition, all records *must be capable of duplication to hard copy* upon the request of a financial examiner.

20 CSR 200-4.010(2) (emphasis added) (for the Court's convenience, attached hereto as **Exhibit 11** and incorporated by reference).  Based on the peek into the CPS afforded by the Claims

Handbook as well as the testimony of Fidelity's employees who handled Captiva's claim referring to a "physical" file, the conclusion is inescapable that at some point a physical file existed and that printing reports of the information contained in the CPS fields is not only easy but is also mandated by Fidelity's own Handbook and Missouri's insurance law. The conclusion is equally inescapable that Fidelity's pattern of delays and obstruction constitutes sanctionable conduct.

*Major Claims Reports*

34.     With respect to the Major Claims Reports, the Court first ordered Fidelity provide the Court with "all Major Claims Reports", and then the Court subsequently ordered Fidelity to produce all such reports to Captiva because Fidelity had waived any claim of privilege to these reports by failing to list them on its privilege log and by offering no explanation as to why it failed to list them. Order (Dkt. 113), at 6. Fidelity did not comply with the Court's order to produce all the Major Claims Reports to Captiva.

35.     As noted above, Captiva first learned of the existence of the Major Claims Reports on March 28, 2012 when it deposed Fidelity's former employee, Mark Dickhute. But like the struggle to overcome Fidelity's delays and obtain the Claims Handbook that led to Captiva discovery of the CPS, the process of deposing Mr. Dickhute, which led to Captiva's discovery of Major Claims Reports, was also an unnecessary struggle against Fidelity's delays, which violated the discovery rules.

36.     Captiva intended to depose Mr. Dickhute before Ms. Chevalier (Fidelity's Rule 30(b)(6) designee on claims handling) in order ascertain the facts behind Fidelity's handling of Captiva's claims before ascertaining Fidelity's general claims-handling procedures. Accordingly, Captiva eventually arranged to depose Mr. Dickhute on April 6, 2012 in St. Louis, Missouri (with Fidelity's corporate designee to follow on May 7, 2012), but after Fidelity agreed

to produce him on that date, Fidelity informed Captiva on April 3, 2012 that Mr. Dickhute was no longer employed by Fidelity and he would not, as a result, be produced for his deposition. Here it is important to note that the basis Fidelity articulated for not being able to produce Mr. Dickhute was that "he is (a) no longer employed by Fidelity; and (b) beyond our control." E-mail correspondence from S. Briner to S. Hall, Apr. 3, 2012, attached hereto as **Exhibit 14** and incorporated herein by reference. Yet, to the contrary, Fidelity still exerted control over its recently-fired employee because Mr. Dickhute testified that on March 29, 2012, after being fired on March 28, 2012, he met with Fidelity's counsel in preparation for his deposition. Dickhute Depo. (**Ex. 8**), at p. 105, ll. 9-10; p. 9, ll. 17-19. As a result of Fidelity's purported inability to control Mr. Dickhute, Captiva then had to arrange for service of a subpoena on Mr. Dickhute and travel to Omaha, Nebraska (where Mr. Dickhute resides) to depose him on May 23, 2012—after Ms. Chevalier had been deposed on May 7, 2012 and contrary to the deposition sequence Captiva intended and was entitled to realize.

37.     Upon learning of the existence of Major Claims Reports on May 23, 2012 at Mr. Dickhute's deposition, Captiva demanded that Fidelity produce these reports. Fidelity refused, and Captiva (as surveyed above) filed a motion to compel that was granted on August 17, 2012, placing Fidelity on notice that it must produce all Major Claims Reports no later than July 9, 2012 when the Court directed Fidelity to provide these reports to the Court.

38.     Instead of producing the reports ordered by the Court, Fidelity failed to produce Major Claims Reports for four months (apparently, Fidelity also did not produce these to the Court despite the Court's order to turn over "all" such reports). Captiva was only able to discover the existence of these missing reports by the fact that each was preceded with a "table of contents" page that included a date (a page that ceased to appear for reports produced after October 2011, as is discussed more fully below). Captiva acted in good faith and contacted

Fidelity and afforded Fidelity yet another opportunity to produce the Major Claims Reports. *See* Wunderlich/Briner letter (**Ex. 2**).

39.     On September 12, 2012, Fidelity responded and stated that it had "managed to track down copies of excerpts from Major Claims Reports for [three of the missing months]" and was searching for another missing month. *See* Briner/Hall e-mail (**Ex. 3**). Fidelity subsequently failed to provide full copies of all the missing reports and, instead, included only "excerpts or drafts" of missing reports. Briner/Wunderlich letter (**Ex. 5**), at 1.

40.     The fact that Captiva had to even address (and is having to further address) the issue of missing Major Claims Reports with Fidelity coupled with Fidelity's response that it had to "track down" information that Fidelity knew it had to produce for at least a month now (the Court's Order on this matter was issued on August 17, 2012 but the Court had ordered Fidelity to provide it with all of this information on July 9, 2012) shows Fidelity's continuing failure to heed its obligations under the discovery rules and its lack of respect for the Court's authority to order Fidelity to produce "all" Major Claims Reports.

41.     In light of the four missing pre-October 2011 Major Claims Reports, Captiva is rightfully concerned about the completeness of Fidelity's production of the Major Claims Reports after October of 2011 (as well as the gaps before October of 2011, as discussed in Paragraph 38). However, Captiva is denied the opportunity to assess the completeness of post-October 2011 reports because Fidelity has produced those reports in an undated format that only includes a quarterly designation that does not reveal the year. Without more, Captiva has an insufficient basis to determine whether Fidelity's production of Major Claims Reports completed after October 2011 is complete. Captiva has requested more precise information as to the dates of these "quarterly" reports, and Fidelity purports to be looking into this. What is clear is that Fidelity is causing yet another delay that is unjustifiable and prejudicial to Captiva.

42.     There are also some alarming inconsistencies in the Major Claims Reports that suggest that information may have been deleted or altered.  In the "Table of Contents" for the Major Claims Report for October 2010, it is stated that claim no. 351475 begins on page 29, but it actually begins on page 26.  Major Claims Report, Oct. 2010, attached hereto as **<u>Exhibit 12</u>** and incorporated herein by reference.  In the next entry, it says that claim no. 372859 begins on page 26, but it actually begins on page 30.  Of the reports Captiva received, this is the only report wherein the pages are mis-numbered. Given Fidelity's pattern of misconduct, Captiva is not confident that it is being given the information to which it is entitled and that the Court ordered Fidelity to produce to Captiva.

43.     Fidelity's behavior in never disclosing the existence of these critical Major Claims Reports (not even in its privilege log), thereby relegating Captiva to the happenstance of discovering the existence of these reports during the *last* deposition of a fact witnessed noticed by Captiva (Mark Dickhute), is severely prejudicial to Captiva because Captiva is prevented from learning more about the contents of the Major Claims Reports from witnesses previously deposed.  Captiva is further prejudiced by having to incur the costs and fees associated with these depositions, yet, due to Fidelity's failure to heed its discovery obligations, Captiva was denied the opportunity to realize a fair return on the costs and fees it incurred.  Now, Fidelity has thrust Captiva into the position of having to hurriedly process this information mere weeks before trial is set to commence, and to incur the prejudice of having to make potentially risky inferences about its contents after having been denied the opportunity to confirm inferences and conclusions about its contents through the inquiry afforded by depositions.  The prejudice incurred by Captiva can only be somewhat offset by imposing sanctions on Fidelity.

44.     But it does not stop there.  Similar to the effect of finally obtaining Fidelity's

Claims Handbook (and then learning about CPS) or deposing Mr. Dickhute (and then learning

about Major Claims Reports), when Captiva finally gains access to relevant information, Captiva

discovers other relevant and requested information that has not been produced.  This continues to

be the case.  Captiva's review of the Major Claims Reports and CPS information which has been

produced has uncovered a number of potentially crucial documents and files that have not been

produced.

45.     From the CPS, Fidelity produced a screenshot of an index of documents contained

in its Document Management system.  Following this index, the documents themselves were

produced.  The eighth document listed is identified as a "Coverage Letter" with a "Date Created"

date of July 21, 2010.  However, in the documents produced that correspond to the index, there is

no document that corresponds to a date of July 21, 2010.  Where the "Coverage Letter" with

creation date of July 21, 2010 should appear in the sequence of documents produced, there

appears a letter from John Barnes dated October 1, 2009.  Of the twenty-two documents

appearing in the Document Manager index, all (except for one other exception discussed below)

are assigned a "Date Created" date that roughly corresponds with the date appearing on the

document ("Date Created" is believed to be the date on which the document was entered into

Fidelity's CPS).  The one exception is this potentially crucial "Coverage Letter" with a creation

date of July 21, 2010.  In light of Fidelity's course of conduct, Captiva is reasonable in believing

that Fidelity is concealing further information.

46.     The second exception is that the CPS "Document Management" index lists a

"LPS final report" with a date created listing of March 16, 2010, but the LPS Report provided to

Captiva is dated September 30, 2009. Captiva is concerned that there was a second or final LPS report that Fidelity has not produced.

47.    Throughout the CPS materials, mention is made of a "LDR" file (believed to be a "Loan Document Review" file) that has never been produced nor disclosed to Captiva. When Captiva inquired about the existence of a LDR file, Fidelity attempted to mitigate its failure to produce this file by inferring that Captiva supposedly did not request it by stating that the LDR was not part of the requested claims file. *See* E-mail correspondence from S. Briner to R. Wunderlich, Sept. 12, 2012, attached hereto as **Exhibit 13** and incorporated by reference. This evidences Fidelity's gamesmanship for, unless Captiva specifically identifies information it seeks by the correct name, Fidelity contends that such information was not requested and Fidelity was under no obligation to produce it.

48.    Notwithstanding, as noted above, Captiva did request (and the Court ordered produced) documents related to Fidelity's coverage analysis. Also, Fidelity has made it clear that one of its purported reasons for why there is no coverage here is that it did not receive adequate documents from Captiva. Such documents were presumably for Fidelity's "Loan Document Review" process. Such information is relevant and has clearly been requested by Captiva. True to its course of conduct in this lawsuit, Fidelity never disclosed or produced this information to Captiva. Even now, Captiva has not received this file, while Fidelity finally gets around to looking for it, despite the fact that in the materials provided to Captiva reference is made to making "copies" of this file and "forwarding" it to the current claims administrator assigned to the Captiva matter as recently as February 9, 2012. *See* Briner/Wunderlich letter (**Ex. 5**), at 3, ¶ 13; CPS Status Report, Apr. 26, 2012, attached hereto as **Exhibit 16** and incorporated herein by reference, at entry for "2/9/2012" (FNT0009020); *see also* CPS Status Report, July 7, 2011, attached hereto as **Exhibit 17** and incorporated herein by reference, at entry

for "1/5/2011" (FNT004242) (stating that LDR file was "scanned" for digital storage on January 5, 2012).

49.     In the CPS, reference is also made to a "box containg [sic] notebooks" that was sent to Greg Dawley (the present administrator of Captiva's claim under the Policy).  Fidelity never disclosed or produced this box of notebooks to Captiva.  CPS Status Report, Apr. 26, 2012 (**Ex. 16**), at entry for "3/20/2012" (FNT9020).

50.     The CPS materials also make mention of a "final report to Randall McHargue", dated March 16, 2010.  Fidelity never disclosed or produced this report to Captiva.  CPS Status Report, July 7, 2011 (**Ex. 17**), at entry for "3/16/10" (FNT004244).

51.     Similarly, information has been obtained in depositions that evidences Fidelity's concealment of information.  For example, Cara Detring (manager of the agency that issued the Policy) testified that Fidelity's coverage counsel, Jay Levitch, requested documents from her.  Ms. Detring produced a CD to him that contained 642 documents.  Deposition transcript of C. Detring attached hereto as **Exhibit 15** and incorporated by reference, at 84.  When Captiva served a subpoena on Ms. Detring for relevant documents, she produced a CD containing 642 documents that she testified that she believed to be the same collection of documents provided to Mr. Levitch.  Many of the documents contained on this CD had neither been disclosed nor produced to Captiva by Fidelity.  As Mr. Levitch was Fidelity's counsel, Fidelity controlled Mr. Levitch and Fidelity was obligated to disclose/produce the documents obtained by Mr. Levitch but did not do so.

52.     Whatever the reason for this growing list of undisclosed information, what is clear is that Fidelity did not disclose relevant information to Captiva and continues to withhold information from Captiva, requiring Captiva to expend valuable time and effort that should be expended in preparing for trial instead spurring Fidelity into heeding its discovery obligations by

locating undisclosed documents and files that should have been disclosed over a year ago. In view of Fidelity's misconduct inflicted on Captiva and this Court, sanctions should be imposed against Fidelity. Specifically, under Rule 37 sections (c)(1) and (b)(2)(A) or pursuant to its inherent powers, the Court should strike Fidelity's pleadings, proceed to trial on the issue of Captiva's damages only, issue an adverse inference instruction to the jury due to Fidelity's repeated failure to produce relevant information and to heed the Court's orders, and require Fidelity to pay Captiva's attorneys' fees and costs in connection with this case (which would be especially appropriate in light of Captiva's statutory claim for vexatious refusal to pay).

53.     Should the Court decide not to impose more weighty sanctions, Captiva requests that the Court allow Captiva to employ a forensic computer expert to examine Fidelity's computer system—at Fidelity's expense—in order to report on the completeness of Fidelity's production of claims information and afford Captiva—pending the results of this examination—an opportunity to renew its Motion for more significant sanctions.

54.     In further support of this Motion, Captiva hereby incorporates its Memorandum in Support filed concurrently herewith.[4]

WHEREFORE, Captiva respectfully requests that the Court enter an Order imposing appropriate sanctions on Fidelity for the misconduct set forth herein, including the striking of Fidelity's pleadings and awarding Captiva its fees and costs. Alternatively, Captiva requests that the Court exercise its discretionary authority and allow Captiva to employ a computer forensic expert, at Fidelity's expense, to examine Fidelity's computer network and report on the

---

[4] In view of the imminent trial setting, Captiva filed this Motion as soon as possible after discovering Fidelity's misconduct. Captiva reserves the right to amend or supplement its Motion based on its continuing investigation and review of materials produced by Fidelity.

completeness of Fidelity's production of requested information, and grant such other and further

relief as the Court deems appropriate.

Respectfully submitted,

**LEWIS, RICE & FINGERSH, L.C.**

By:    /s/ Steven D. Hall

Richard A. Wunderlich, #27979
Steven D. Hall, #56762MO
600 Washington Ave., Suite 2500
St. Louis, MO 63101
Telephone: 314-444-7600
Facsimile: 314-612-1308
rwunderlich@lewisrice.com
shall@lewisrice.com

*Counsel for Defendant*

**<u>Certificate of Service</u>**

The undersigned certifies that a true and complete copy of the foregoing was served the 17th day of September, 2012 via the Court's ECF system upon all counsel of record.


<u>/s/ Steven D. Hall</u>