IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FIDELITY NATIONAL TITLE ) <br> INSURANCE COMPANY, SUCCESSOR ) <br> BY-MERGER TO LAWYERS TITLE ) <br> INSURANCE CORPORATION, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CAPTIVA LAKE INVESTMENTS, L.L.C., ) <br> ) <br> Defendant. ) | Case No. 4:10-cv-01890-CEJ |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND STATEMENT OF UNCONTROVERTED FACTS**

COMES NOW Defendant Captiva Lake Investments, L.L.C. ("Captiva"), by and through its undersigned counsel and pursuant to the Court's Order of November 13, 2012 (Dkt. 174), and in support of its Motion for Summary Judgment, asks the Court to grant judgment in its favor on all counts of the Complaint filed by Plaintiff Fidelity National Title Insurance Company, successor by merger to Lawyers Title Insurance Corporation ("Fidelity") and grant Captiva judgment on Counts I (declaratory judgment), II (breach of policy obligation to defend) and IV (breach of policy obligation to indemnify) of Captiva's Counterclaim, reserving the apportionment of damages for the jury (as well as resolution of Count III of the Counterclaim for tortious interference). In support, Captiva states as follows:

1. This Motion concerns the rights and duties under a title insurance loan policy ("Policy") issued by Fidelity.

2. Captiva became the insured under the Policy after Captiva purchased the underlying indebtedness and took an assignment of the Policy from its predecessor-in-interest

1877461

(National City Bank, or "NCB") who had purchased the Policy in connection with a twenty-two million dollar loan to complete a condominium project known as the Majestic Pointe Development on property located on Lake of the Ozarks ("Property").

     3.     The loan was secured by the insured deed of trust on the Property ("Deed of Trust"), which Captiva obtained with the indebtedness and subsequently foreclosed on.

     4.     The Policy affords coverage "against loss or damage . . . sustained or incurred by the insured by reason of" specified occurrences, including:

> 3. Unmarketability of the title;
> . . .
> 7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material: (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy] the insured has advanced or is obligated to advance; . . .
> [Fidelity] will also pay costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage . . . .

     5.     The purpose of the Policy was to ensure that the insured's Deed of Trust would be a prior lien on the Property and that title to the Property would not be unmarketable due to any lien for which coverage was extended. By issuing the Policy, Fidelity guaranteed that it would compensate the insured for losses or damages sustained by the lack of priority of the insured's Deed of Trust over any mechanic's lien and loss or damage sustained by reason of unmarketability of title incurred as a result of any mechanic's lien. Coverage against such loss or damage was provided on a go forward basis from the effective dates of the Policy as it pertained to mechanic's liens. Fidelity promised to defend and indemnify Captiva up to a policy limit of $22,380,000.00.

6. Captiva incurred losses and damages when various mechanic's liens (the "Mechanic's Liens") were filed against the Property in the amount of $6,849,821.87 and impaired the priority of Captiva's Deed of Trust.

7. The amount of loss or damage incurred is determined by the lien amounts established and the unmarketability damages incurred as a result of Mechanic's Liens.

8. Captiva made a claim under the Policy for its losses and damages (including its unmarketable title) caused by the filing and prosecution of the Mechanic's Liens and demanded that Fidelity defend and indemnify Captiva.

9. Fidelity filed this lawsuit asking the Court to rule that there was no coverage under the Policy (Counts I – IV of Complaint), and Captiva counterclaimed asking for a determination that coverage does exist under the Policy (Count I of Counterclaim) and seeks compensation for its losses and damages as provided for by the Policy and law. Additionally, Captiva asserted counterclaims against Fidelity for breaching its obligations under the Policy to properly defend (Count II of Counterclaim) and indemnify (Count IV of Counterclaim) as well as a claim for Fidelity's vexatious refusal under Mo. Rev. Stat. § 375.296. (Captiva also filed a counterclaim for tortious interference against Fidelity (Count III), but that count is not subject to this Motion.)

10. Fidelity argues that it is absolved from affording coverage to Captiva for Captiva's claim on account of non-prudent lending and fund disbursing practices in which Captiva's predecessor in interest purportedly engaged. However, other courts have considered this precise situation (even where it was Fidelity or an affiliated companies that put forward the argument) and the exact policy language at issue here and have ruled as a matter of law that a lack of prudence in lending or disbursing funds by a lender does not trigger the coverage

3

exclusion urged by Fidelity here. *See Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 511–12 (6th Cir. 2012); *see also Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732–34 (7th Cir. 2012); *Chi. Title Ins. Co. v. Resolution Trust Corp.*, 53 F.3d 899, 905, 908 (8th Cir. 1995).

11. As a matter of law, the Policy affords coverage as the terms of an insurance contract are construed in favor of the insured (Captiva) and against the insurer (Fidelity), and "if reasonably possible . . . the [policy] will be construed so as to afford coverage." *Am. Family Mut. Ins. Co. v. Brown*, 657 S.W.2d 273, 275 (Mo. Ct. App. 1983); *see also Burns v. Smith*, 303 S.W.3d 505, 512 (Mo. 2010); *Foremost Constr. Co. v. Killam,* 399 S.W.2d 593, 596 (Mo. Ct. App. 1966); *Am. Family Mut. Ins. Co. v. St. Clair*, 295 S.W.3d 586, 592 (Mo. Ct. App. 2009). In accord with the clear language of the Policy, the Court should rule that there is coverage under the Policy.

12. Furthermore, the Court should rule that Fidelity breached its obligations under the Policy when Fidelity purportedly opted to defend but did not and failed to accept coverage and compensate Captiva for its losses and damages caused by the impairment of its title's priority in the Property. Specifically, Fidelity failed to defend and indemnify Captiva by refusing to properly defend Captiva against the Mechanic's Liens, refusing to investigate and challenge overstated liens, refusing to pay for settling liens, surreptitiously limiting the scope of Captiva's defense, using counsel retained to defend Captiva for coverage-related matters, refusing to retain new counsel after Captiva requested such, and denying Captiva access to its own file.

13. Captiva is filing a Memorandum in Support of this Motion which it incorporates herein by reference, and Captiva's Statement of Uncontroverted Fact is appended hereto.

WHEREFORE, Defendant Captiva Lake Investments, L.L.C., prays that the Court enter an order granting summary judgment in its favor on Counts I, II and IV of Captiva's Counterclaim and against Plaintiff Fidelity National Title Insurance Company, successor by merger to Lawyers Title Insurance Corporation, on all counts of Plaintiff's Complaint, and for such further relief as the Court deems necessary and just.

## STATEMENT OF UNCONTROVERTED FACTS

1. In 2009, Captiva[1] became the owner of certain land and improvements thereon, situated in Camden County, Missouri ("Property"), commonly known as Majestic Pointe Development ("Project"), and the insured under a title insurance policy issued by Fidelity, No. G52-0582755 originally dated March 15, 2006 with an original coverage amount of $21,280,000.00 (a modification endorsement brought the date of Policy up to October 25, 2007 and increased the coverage amount to $22,380,000.00) (collectively, the "Policy"). *See* Policy and Modification Endorsement, attached hereto and incorporated herein by reference as **Exhibit 1**; *see generally*, Assignment of Loan and Loan Documents and Amended and Restated Loan Sale Agreement, attached hereto and incorporated herein by reference as **Exhibit 2**.

2. The Policy affords coverage for "loss or damage . . . sustained or incurred" due to certain occurrences, including:

   > 3. Unmarketability of the title;
   > . . .
   > 7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material: (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness

---

[1] The principals of Captiva are Jack Davis, Benjamin Stegmann, and Daniel Stegmann.

> secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
>
> . . .
>
> [Fidelity] will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage . . . .

Policy (**Ex. 1**), at 2.  As was requested, the Policy did not have an exception for mechanic's liens.  See McNearney/Guarantee Land Title Letter and attached pro forma loan policy, attached hereto and incorporated by reference as **Exhibit 3**, at ¶ 5 (page 3 of letter) (also note that the pro forma policy attached to Mr. McNearney's letter crosses-out the standard exception for mechanic's liens, at bates number NCB_MPDC-000514).

      3.     Certain mechanic's liens ("Mechanic's Liens") were filed against the Property in the amount of or about $6,849,821.87 which impaired Captiva's title and have been adjudicated to have priority.  *See* Compl. ¶¶ 53, 76 (Dkt. 1); Def.'s Answer, Affirmative Defenses, & Countercl. at 19–21 ¶¶ 20–35, Dkt. 2; *see generally* Judgment, *Grau Contracting Inc. v. National City Bank, et al.*, No. 08CM-CC00412 (consolidated) (Circuit Court of Camden County, Missouri, Sept. 19, 2012), attached hereto as **Exhibit 4** and incorporated herein by reference.

      4.     Captiva made a claim on the Policy on or about July 29, 2009, specifically invoking insuring provision number 7 (Lack of Priority) of the Policy (set forth in Paragraph 2, *infra*) and demanding that Fidelity defend Captiva against the Mechanic's Liens and that Fidelity satisfy any payments owing to these claimants.  Barnes[2]/Fidelity Letter, July 29, 2009, attached hereto and incorporated herein by reference as **Exhibit 5**.

      5.     Fidelity (via its Senior Claims Counsel Lance Perna) responded on August 20, 2009 and again on September 8, 2009 and acknowledged Captiva's claim and informed Captiva

---

[2] John "Jack" Barnes served as counsel for Captiva in making the claim under the Policy.

6

that coverage was "likely."  Perna/Barnes Letters, Aug. 20, 2009 (second paragraph) and Sept. 8, 2009 (first paragraph) attached hereto as **Exhibit 6** and incorporated herein by reference.

6. Consistent with Fidelity's representations to Captiva, Mr. Perna's evaluation of Captiva's claim is capsulized in his Request to Retain Outside Counsel, in which he concludes in September of 2009 that the Mechanic's Liens "create[] a duty to defend[,]" and he indicates "No" to the form's inquiry if the claim is "excepted or excluded" from coverage and that other coverage issues are "unlikely."  Perna, Request to Retain Outside Counsel, Sept. 14, 2009, attached hereto as **Exhibit 7** and incorporated herein by reference, at 1 (under heading of "Claim Summary") and 1–2 (under heading of "Coverage").

7. On October 1, 2009, Mr. Perna informed Captiva that Fidelity agreed to defend against Mechanic's Lien claims, subject to a reservation of rights, and that Fidelity had retained the law firm of Sauerwein Simon & Blanchard, P.C. (also referred to herein as the "Sauerwein law firm" or "SSB") as counsel for Captiva.  Perna/Barnes Letter, Oct. 1, 2009, attached hereto as **Exhibit 8** and incorporated herein by reference.  Fidelity informed Captiva as follows:

> Mr. Sauerwein's firm will defend the insured in that action and has all attendant fiduciary duties related to such representation, including the attorney-client privilege. . . . Retained counsel has been hired solely to defend the insured's interest in regards to the [M]echanic's [L]ien litigation.  This representation does not encompass legal advice or opinions regarding coverage issues under the policy.

*Id.* (**Ex. 8**), at 2.  However, Fidelity also stated that if it eventually declined coverage, Fidelity would require Captiva to reimburse Fidelity for attorney's fees paid to SSB.  *Id.*

8. In November of 2009, Captiva arranged to sell the Property to an investor (MLake 75, LLC or "MLake 75") subject to Captiva's ability to procure title insurance coverage for the

7

Mechanic's Liens. Membership Interest and Purchase Agreement, Nov. 3, 2009, attached hereto as **Exhibit 9** and incorporated herein by reference.

9. Captiva requested that Fidelity "insure over" the Mechanic's Liens in facilitating the sale of the Property to MLake 75, but Fidelity refused. See Barnes/Perna E-mail, Nov. 5, 2009 and Perna/Barnes Letter, Dec. 9, 2009, both documents attached hereto as **Exhibit 10** and incorporated herein by reference.

10. MLake 75 terminated the sale contract after it discovered the unmarketable nature of Captiva's title to the Property and learned of Fidelity's refusal to insure over the Mechanic's Liens. *See generally*, Termination of Membership Interest Purchase and Sale Agreement, Nov. 17, 2009, attached hereto as **Exhibit 11** and incorporated herein by reference; *see also* Deposition of C. Sneed ("Sneed Depo."), attached hereto as **Exhibit 12** and incorporated herein by reference, at 57:24–58:2. The buyer's principal, Chadwick Sneed, testified that "the [M]echanic's [L]iens were of great interest to us and made the project a yes or no project effectively." *Id.* (**Ex. 12)**, at 29:17–19. When asked if the existence of the Mechanic's Liens is what caused MLake 75 to terminate the contract for the sale of the Property from Captiva, Mr. Sneed responded with an unequivocal: "Yes." *Id.* at 58:2.

11. As a result of Captiva's inability to sell the Property, Captiva again made the claim for coverage, specifically citing insuring provision number 3 (Marketability of Title) of the Policy (set forth in Paragraph 2, *infra*) and demanding that Fidelity indemnify Captiva for its losses. Barnes/Fidelity Letter, Aug. 3, 2010, attached hereto and incorporated by reference as **Exhibit 13**. Although Fidelity acknowledged Captiva's demand, it did not provide coverage.

See Dickhute[3]/Wunderlich Letter, Oct. 29, 2010, attached hereto and incorporated by reference as **Exhibit 14**, at 16 (under the heading, "E. Coverage For Unmarketable Title").

12.  Unable to sell the Property, Captiva sought financing to "go forward" and complete the Project, which promoted benefits such as the prevention of further damage to the Property caused by the weather's effect on the Project's unfinished structures.  Deposition of D. Stegmann ("D. Stegmann Depo."),[4] attached hereto and incorporated by reference as **Exhibit 15**, at 345–50, 358:16–359:2.  However, no bank would provide a loan in the absence of the title insurance—insuring over the Mechanic's Liens—which Fidelity refused to provide.  *See, e.g.,* Whitaker (Midwest BankCentre)/Stegmann (Captiva) Letter, Sept. 8, 2010, attached hereto and incorporated by reference as **Exhibit 16**.

13.  Despite Fidelity's refusal to afford the coverage that would have facilitated the sale of the Property or completion of the Project, Fidelity's investigation (now nearing its sixth month) continued to support a conclusion that "[c]overage appears likely," confirming Fidelity's earlier conclusions with respect to coverage.  Perna, Significant Claim Report, Jan. 13, 2010, attached hereto and incorporated by reference as **Exhibit 17**, at 1 (under heading of "Nature of Claim").

14.  Indeed, Fidelity's internal documents identify a "Completion Date" for the "Coverage Analysis" as having occurred on September 14, 2009, at which time the "[d]ecision" was to "[a]ccept[,]" specifically admitting that "[a] duty of both defense and indemnity appear to exist."  Claims Processing System Status Report, July 7, 2011, attached hereto and incorporated by reference as **Exhibit 18**, at entry for Sept. 14, 2009 on page 1 of exhibit (FNT004241).

---

[3] Mark Dickhute administered Captiva's claim after it was transferred to him from Lance Perna.
[4] Daniel Stegmann is one of the three principals of Captiva.

15. Similarly and notwithstanding the positions that Fidelity has asserted in this lawsuit, Fidelity confirmed no later than early 2010 that the "Policy [was] issued without any M[echanic's] L[ien] exceptions" (**Ex. 17**, at 2) and has reason to know that disbursement practices that Fidelity would charge in this lawsuit as being the fault of Captiva's predecessor and justified a denial of coverage were *not* likely true. *See, e.g.*, Deposition of C. Detring ("Detring Depo."), attached hereto as **Exhibit 39** and incorporated herein by reference, at 55:22–56:5; *see also id.* at 60:16-21, 61; Report (**Ex. 17**), at 2 (under heading "Recoupment/Workout") (Fidelity's "agent failed to properly obtain lien waivers" that might evidence shoddy fund disbursement practices).)

16. In February 2010, Captiva's claim was transferred from Senior Claims Counsel, Lance Perna, to Regional Major Claims Attorney, Mark Dickhute.  However, Fidelity's conclusion that there was coverage did not change.  In a report authored by Mr. Dickhute in November 2010 (one month *after* Fidelity filed this lawsuit), Mr. Dickhute wrote on one page that "[c]overage appears likely" (under the heading "Nature of Claim") and then on the following page of the same report wrote that "coverage will be denied" nevertheless (under the heading "LEGAL ARGUMENTS," last paragraph).  M. Dickhute, Major Claims Report, Nov. 2010, attached hereto and incorporated by reference as **Exhibit 19**, at 5 (FNT0009036) and 6 (FNT0009037).

17. Mr. Dickhute testified that Fidelity denied coverage but admitted that Fidelity did not tell Captiva of this decision, leaving Captiva to rely on Fidelity's representation in October of 2009 that Fidelity was defending Captiva through the services of the Sauerwein law firm.  *See* Deposition of M. Dickhute, attached hereto as **Exhibit 20** and incorporated by reference, at 144:

10–16, 145:23–148:12, 254:9–11, 19–20; *see also id.* at 147:8–13, 204:9–15, 205:12–17, 253: 6–20.

18. Fidelity also did not tell Captiva (until well after Fidelity told SSB) that Fidelity had limited the scope of Sauerwein law firm's representation of Captiva in the Mechanic's Lien litigation.[5] Fidelity surreptitiously instructed SSB not to advance defenses which, in the words of SSB attorney Martin Blanchard, "could, if successful, [] reduce the *amount* of the mechanic's lien … [.]" Dickhute/Bond[6] E-mail, Apr. 14, 2010, attached hereto and incorporated by reference as **Exhibit 21**, at 1 ("The adequacy of the work performed . . . seems beyond scope of [SSB's] rentention . . . [which] is concerned solely with the validity and priority of the lien."); Blanchard/Davis[7] (Captiva) Letter, Apr. 4, 2011, attached hereto as **Exhibit 22** and incorporated by reference, at 3. Despite Fidelity instructing SSB no later than April of 2010 to limit its representation of Captiva, Captiva was not informed of Fidelity's limitations on SSB's representation of Captiva until a year later, in April of 2011. *See generally,* Davis (Captiva)/Blanchard Letter, May 19, 2011, attached hereto as **Exhibit 23** and incorporated herein by reference; *see also* Blanchard/Davis Ltr. (**Ex. 22**), at 2–3.

19. Because of Fidelity's limitation on Captiva's defense, SSB would not act upon evidence (largely procured by Captiva) showing that the work alleged in the Mechanics' Liens was not, in some instances, performed, and, in other instances, materials alleged to have been

---

[5] Based on internal correspondence between SSB personnel (attorneys Trent Bond and Martin Blanchard) during the same time period in which Fidelity lead Captiva to believe that it would receiving a full defense, SSB *also* appeared to believe it was retained to provide Captiva a full defense. Documents obtained in discovery show that SSB initially believed it was retained to advance defenses which would include those focused on priority and those which would diminish the amounts claimed as a result of defective work, failure to supply materials, and/or overpayment. SSB intended to verify that the materials and work the Mechanics' Lien claimants claimed they provided was accurate. *See, e.g.,* Blanchard/Bond E-mail, Nov. 12, 2009, attached hereto as **Exhibit 40** and incorporated herein by reference, at 1 ("It'd be great to kill some of these liens due to overpayment, or defective work. Heck, we may even have some slander of title counterclaims.")

[6] Trent Bond is an attorney at SSB who assisted Martin Blanchard (the lead SSB attorney) in the Mechanic's Lien litigation.

[7] Jack Davis is one of the three principals of Captiva.

11

incorporated into the Property were not put into the Property's development. *See, e.g.,* Blanchard/Davis Letter, Dec. 10, 2010, attached hereto as **Exhibit 24** and incorporated herein by reference, at 2; Dickhute/Wunderlich Letter, May 13, 2011, attached hereto as **Exhibit 25** and incorporated herein by reference, at 2 (incongruously stating that Fidelity had a "right" to investigate but not a "duty" to investigate the overstated liens). Captiva engaged in an effort to, in its own words, "identify what has been completed and what had not been completed on the [P]roperty (i.e. what/how much drywall has been furnished, installed, etc.) and then compare that to the scope of the work set forth in the original subcontractor contract in order to estimate the amount of valid liens . . . [i]n doing so, we (Captiva) have estimated that there are hundreds of thousands of dollars in lien amount reductions that should be pursued." B. Stegmann[8] (Captiva)/Blanchard E-mail String, Dec. 6, 2010, attached hereto as **Exhibit 26** and incorporated herein by reference, at 2. As it progressed, Captiva learned that lien amounts were, in many cases, grossly overstated and materials and work billed for in the Mechanics' Liens had never been provided, yet Fidelity refused to act on this information. Specifically, for example:

(a) Fidelity refused to act upon an admission by a lien claimant (Questec Constructors, Inc.) that fixtures (which had been claimed as part of the lien) were never installed and were in the possession of the claimant, and the overstated Questec lien became perfected. *See* Deposition of S. Boyd (Mechanic's Lien litigation), attached hereto as **Exhibit 27** and incorporated herein by reference, at 85:15–23.

(b) Fidelity did not act upon lien waivers that some claimants executed, allowing, instead, for these overstated liens to be perfected. Lien waivers, attached hereto as **Exhibit 28** and incorporated herein by reference.

---

[8] Benjamin Stegmann is one of the three principals of Captiva.

12

Despite this compelling evidence of overstated liens, Fidelity persisted in its refusal to authorize SSB to undertake any investigation into whether the liens were overstated or assert clearly applicable defense against the Mechanics' Liens. Blanchard/Davis Ltr. (**Ex. 25**), at 1–2.

20. Captiva, baffled as to why Fidelity refused to act upon compelling evidence that the Mechanics' Liens were overstated, was forced to hire its own counsel in the summer of 2011 at its own expense to challenge the Mechanics' Liens. Affidavit of J. Davis, attached hereto as **Exhibit 29** and incorporated herein by reference, at ¶¶ 4–13. However, by this time it was too late. Captiva had participated in the Mechanic's Lien litigation since early 2010 and discovery had closed. *Id.* at ¶¶ 5, 17. When counsel hired by Captiva attempted to present evidence to the court that the liens were overstated, the court was incredulous that such evidence was not presented earlier. *Id.* at ¶ 17. Given the late stage of the litigation, the court refused to allow Captiva's counsel to present evidence that the liens were overstated. *Id.*

21. Fidelity refused to entertain settlement offers. Specifically, when Captiva negotiated with one lien claimant, Grau Contracting, Inc., Captiva was able to obtain a settlement of Grau's lien of $454,000.00 in exchange for payment of $5,000.00. Fidelity refused the offer, and Captiva made payment to Grau for $5,000.00. See Dickhute/Wunderlich Letter, Jan. 18, 2011, attached hereto as **Exhibit 30** and incorporated herein by reference.

22. Captiva's frustration over SSB's reluctance to challenge Mechanic's Liens that were clearly overstated led Captiva to request new counsel, but Fidelity denied Captiva's request. See Davis/Blanchard E-mail, Feb. 3, 2010, attached hereto as **Exhibit 31** and incorporated herein by reference.

23. Captiva's frustrations with SSB's "defense" led Captiva to also request that SSB allow Captiva to review Captiva's file. Fidelity instructed SSB to refuse Captiva's request and,

on Fidelity's orders, SSB did so refuse. B. Stegmann/Blanchard Letter, Aug. 25, 2010 (request for file) (bates numbers SSB03272–73); Blanchard/Dickhute E-mail, May 7, 2010 (stating that Captiva has "a right to know of communications, but not to the contents of them. I say no.") (bates number FNT0003388–89); Blanchard/Bond E-mail, Sept. 3, 2010 (containing internal SSB communications showing that SSB followed Fidelity's instruction, at 5–7 of exhibit), (referenced documents attached hereto as **Exhibit 32** and incorporated herein by reference).

24. Unbeknownst to Captiva, Fidelity consulted SSB on coverage-related matters, despite Fidelity's express assurance to Captiva that SSB was "hired solely to defend [Captiva]" and would not be used to obtain "legal advice or opinions regarding coverage issues under the [P]olicy." (**Ex. 8**), at 2; *see also* Deposition of L. Perna, attached hereto as **Exhibit 33** and incorporated herein by reference, at 46:12–14, 47:5–11 ("[Captiva was] a client of [SSB] and that [SSB] had the same obligations to Captiva as they would to any other client . . . [and Fidelity] didn't have an attorney-client relationship [with SSB]"). Violating its own representations to Captiva and betraying its own understanding of Captiva's attorney-client relationship with SSB, Fidelity sought and obtained SSB's advice and opinion concerning Fidelity's response to a complaint Captiva had filed with the Missouri Department of Insurance concerning coverage. Dickhute/Blanchard E-mail String, Mar. 31, 2010, with attached draft of Dickhute/Mo. Dep't of Ins. Letter, documents attached hereto as **Exhibit 34** and incorporated herein by reference. Additionally, Fidelity openly shared other coverage-related correspondence with SSB, despite Fidelity's assurances to Captiva to the contrary. *See, e.g.,* Dickhute/Blanchard E-mails with attachment, documents attached hereto as **Exhibit 35** and incorporated herein by reference.

25.     To date, Fidelity has neither withdrawn its reservation of rights nor communicated a clear coverage determination to Captiva, contrary to Missouri law.  *Compare* Mo. Code Regs. Ann. tit. 20, § 100-1.050(1)(C) (if an insurer cannot make a coverage determination within 15 days, the insurer must so inform the insured (and every 45 days thereafter during which the coverage determination has not been made) and explain the reasons why a determination cannot be made) (for the convenience of the Court, the regulation is attached hereto as **Exhibit 36** and incorporated herein by reference) with Perna/Barnes Ltr.(**Ex. 10**), at 2 ("I do not believe there is any time deadlines for [Fidelity] to confirm or deny coverage in this matter . . . .").

26.     Instead, Fidelity asserted (and continues to assert here) that various Policy exclusions apply when Fidelity knows (or has reason to know) that such exclusions are unjustified and asserting their applicability is unreasonable.  When the applicability of one exclusion is disproven to the point that continuing to maintain its applicability would be patently ridiculous, Fidelity simple turns its attention to another exclusion and asserts that it applies instead.  To illustrate this, Fidelity initially took the position that the Policy was improperly issued and only mistakenly contained coverage for mechanic's liens, however Fidelity's expert, J. Nielsen, told Fidelity that the Policy was properly issued.  *See* G. Dawley, Claims Processing System Status Report, Dec. 14, 2011, attached hereto as **Exhibit 37** and incorporated herein by reference (page "2 of 12" at FNT0009021).  At other times, Fidelity took the position that coverage was excluded because the loan was not fully funded, despite the absence of such a requirement in the Policy and clear indication in the lender's closing letter to the Fidelity's agent that a requirement of fully funding of the loan could not be placed in the Policy.  *See* Policy (**Ex. 1**), at Schedule B – Section 1 ("Requirements"); McNearney/GLT Ltr. and pro forma title policy (**Ex. 3**), at bates number NCB_MPDC-000512 ("Item (a)").  Then, at other times, Fidelity

15

asserted that the pending disbursement endorsements that were issued in conjunction with loan disbursements (long after the Policy was issued) altered the terms of coverage and excepted the Mechanic's Liens from coverage. However, Fidelity acknowledged internally that its own coverage counsel has "doubts … about the validity" of this argument but, undeterred, Fidelity concluded that coverage will nevertheless "be denied[9] on [that] basis" and this lawsuit filed. M. Dickhute, Major Claims Report, Sept. 2010, attached hereto as **Exhibit 38** and incorporated herein by reference, at FNT0006428 (page 4 of exhibit); Detring Depo, (**Ex. 39**), at 70-71 (testifying that the pending disbursement endorsements do not except the Mechanic's Liens from coverage and the purpose of the endorsements is merely notify the bank that liens were filed); *see also* SOMF 15.

27. On September 19, 2012, the court in the Mechanic's Lien litigation entered judgment in favor of some of the lien claimants in the amount of $936,016.82, excluding a significant amount of interest. (**Ex. 4**, at 4).

Respectfully submitted,

LEWIS, RICE & FINGERSH, L.C.

By: /s/ Steven D. Hall
Richard A. Wunderlich, #27979
Steven D. Hall, #56762MO
600 Washington Ave., Suite 2500
St. Louis, MO 63101
Telephone: 314-444-7600
Facsimile: 314-612-1308
rwunderlich@lewisrice.com
shall@lewisrice.com

*Counsel for Defendant*

---

[9] The decision to deny was not communicated to Captiva.

**Certificate of Service**

The undersigned certifies that a true and complete copy of the foregoing was served the 14th day of January, 2013 via the Court's ECF system upon all counsel of record.

/s/ Steven D. Hall