UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


FIDELITY NATIONAL TITLE INSURANCE   )
COMPANY,   )
   )
                Plaintiff,   )
   )
     v.   ) No. 4:10-CV-1890-CEJ
   )
CAPTIVA LAKE INVESTMENTS, LLC,   )
   )
               Defendant.   )



MOTION HEARING


BEFORE THE HONORABLE CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


APRIL 23, 2013

APPEARANCES:

For Plaintiff:      Thomas J. Fritzlen, Jr., Esq.
                     Shawn T. Briner, Esq.
                     **MARTIN, LEIGH, LAWS & FRITZLEN P.C.**

For Defendant:      Steven D. Hall, Esq.
                     Richard A. Wunderlich, Esq.
                     **LEWIS, RICE & FINGERSH, L.C.**

*REPORTED BY:*       *Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter*
                     *United States District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102*
                     *(314) 244-7987*

1     (Proceedings began at 10:31 a.m.)

2          THE COURT:  Good morning.

3          MR. WUNDERLICH:  Good morning, Judge.

4          MR. BRINER:  Good morning, Your Honor.

5          THE COURT:  Who is here for the Plaintiff?

6          MR. BRINER:  Good morning again, Your Honor.  Shawn

7     Briner and Tom Fritzlen on behalf of the Plaintiff.  The

8     Plaintiff is also present through its corporate

9     representative, Greg Dawley.

10          THE COURT:  Would you spell the last name again,

11    please?

12          MR. BRINER:  Mr. Dawley's last name is D-A-W-L-E-Y.

13          THE COURT:  All right.  Thank you.

14          MR. BRINER:  You're welcome.

15          THE COURT:  And for the Defendant.

16          MR. WUNDERLICH:  Good morning, Your Honor.  Rick

17    Wunderlich and Steven Hall on behalf of Captiva.  We also have

18    with us representatives of the company, Mr. Ben Stegmann,

19    Mr. Dan Stegmann, and Mr. Jack Davis.  We also have Tony

20    Whitledge here, Your Honor.

21          THE COURT:  All right.  I scheduled this hearing on

22    the motion requesting appointment of Mr. Whitledge as an

23    individual to inspect the Plaintiff's computer system, and I

24    know that you all have briefed the issue extensively, and I

25    don't want to waste your time by having you repeat everything

1   that you've put in your written pleadings, but I -- I do have,

2   I guess, some fundamental questions, and I'd like to give each

3   of you the opportunity to present your best arguments on this.

4   This is not the typical motion, and because it is -- if the

5   motion is granted it would require the Plaintiff to open its

6   computer system to, essentially, a stranger, I think it's

7   important that I know as much about this as I can.  So this is

8   the Defendant's motion, so I'm going to start with the

9   Defendant.  Mr. Wunderlich, are you -- can you answer a few

10  questions for me?

11          MR. WUNDERLICH:  I can, Your Honor.

12          THE COURT:  Okay.

13          MR. WUNDERLICH:  Your Honor, just also with respect

14  to any questions you have, Mr. Whitledge is here and can

15  answer questions also if the Court would like.  He is an

16  attorney, and so he's a member of the bar also.

17          THE COURT:  All right.  Well, if it -- if it comes to

18  that, then I will certainly ask -- direct the questions to

19  him.  Tell me, what is it that -- what would you have

20  Mr. Whitledge look for in the inspection?

21          MR. WUNDERLICH:  Your Honor, it's pretty simple.

22  What we would ask him to do is really focused on three

23  buckets.  One is the Major Claims Reports that are missing

24  that the Court has ordered to be produced.

25          THE COURT:  I'm sorry.  The --

1      MR. WUNDERLICH:  Major Claims Reports.

2      THE COURT:  Yes, uh-huh.

3      MR. WUNDERLICH:  The second is CPS documents that the

4  Court had ordered Fidelity to produce, and what we discovered

5  in as late as January -- CPS documents were produced in

6  January when they should have been produced back in September

7  when the Court ordered them to do so.  You ordered them to

8  produce everything there.  We believe that there are

9  additional documents that have been either removed from that

10  system or archived in that system, and when you look at the

11  affidavits and information that has been presented by Fidelity

12  in this case, they don't tell the Court or Captiva some really

13  important things.  They say there's no historical data there,

14  but what they don't tell you is has anything been deleted,

15  have they gone and looked in any files for us.

16      The other thing I would point out to the Court, the

17  third bucket, would be emails.  In the affidavits of

18  Mr. Dawley and other people that they've submitted in response

19  to our motion, they talk about these Major Claims Reports were

20  sent by email, they're all done electronically, they're not

21  printed, but they don't produce any emails of the supervisors.

22  Both Mr. Perna and Mr. Dickhute testified in their

23  depositions, when we first found out about these, that they

24  should supply these to their supervisors.  There's not been

25  one email that I can point to the Court or that we can locate

1 where there's an email attaching the Major Claims Report to

2 the supervisor.  They say here are the reports, here's the

3 excerpts from the reports, and the reports that are missing

4 are critical reports.  They're right in the period of time

5 when we believe Mark Dickhute, the individual responsible for

6 handling the claim at the time, had actually made a

7 determination that there is no coverage and failed to advise

8 Captiva of that information.

9 　　　　　The other point I would make to the Court is that the

10 affidavits that have been supplied in response to our motion

11 by Fidelity -- it's an affidavit from an individual by the

12 name of Matthew Rini, and, Your Honor, I have and I can

13 produce to the Court and show the Court his information that

14 he puts out on the network.  He's a -- they identify him as

15 being an Assistant Vice President.  His résumé doesn't

16 indicate that he has any ability to know what a system is made

17 of, to know what is behind a system.  He basically puts on his

18 résumé he's an actor who specializes in legalese.  He puts --

19 puts out an -- on his résumé that he is employed by Fidelity,

20 but there's nothing in his résumé that indicates he's got any

21 knowledge about computer systems, and what we have --

22 Mr. Whitledge, in his affidavit, clearly has stated and has

23 provided sworn testimony by way of his affidavit that it would

24 take a special -- special training and education and

25 experience to know what a system is built on.  What Fidelity

1 doesn't tell you -- they don't tell you what even the

2 underlying system is. They're trying to make you believe that

3 there's some stand-alone computer in the corner that this

4 information is on and it's not connected to anything else,

5 but, however, in a number of their affidavits, they make

6 reference to networks, they make reference to other documents,

7 and there's no indication they've searched any of that.

8 Mr. Rini doesn't say he's searched any of that or even he's

9 got the capability or the access to it. So we believe there

10 are documents that have been in the CPS system that have

11 either been removed, have been archived someplace else, and

12 Mr. Whitledge, based on what his experience has been and what

13 he's seen so far, has also attested to that in his affidavit.

14 So that's kind of an overview, Your Honor.

15 THE COURT: All right. And exactly how would this

16 inspection be performed?

17 MR. WUNDERLICH: Your Honor, that was the question I

18 had because I knew the Court would be very concerned about

19 protection of Fidelity's information. Clearly, Mr. Whitledge

20 is willing to sign any kind of protective order the Court puts

21 in place, or, you know, we're willing to do that without any

22 question, but more importantly, he's not going to get in there

23 and put his hands on computers. That's not what he intends to

24 do. What he intends to do -- and he can speak to this

25 probably much more knowledgeably than I can, Your Honor, but

1  what I understand him to do is he is going to sit down with

2  someone at Fidelity and ask them questions and ask them to

3  show him what is the basis of the underlying system, what does

4  it network to, what is it you've searched, can you search

5  this, can you go look at this, can you look in these archives

6  to find these type of things, and if there would be something

7  that would be clearly not within the scope of the Court's

8  order, that could be segregated and can be brought to the

9  Court's attention, but clearly, with respect to whether things

10 have been removed from the CPS system and what's been removed,

11 when it was removed, what emails there are, what -- what email

12 document hold process was even put in place, we've never been

13 told that by Fidelity. All we've been told is, "We can't find

14 any archived information; when I push these buttons, it

15 doesn't come up." Well, Mr. Whitledge can get in there with

16 someone from Fidelity and instruct them that he needs them to

17 look at these files, he needs them to look at this part of

18 their records and hopefully make a determination whether or

19 not things have been deleted, things can be located, or

20 whether things never existed.

21          THE COURT: Okay.

22          MR. WUNDERLICH: We have not brought this motion,

23 Your Honor, without really good foundation because based on

24 the number of documents that were supplied to us in late

25 January, after -- and about the same time our motions were

1    filed, there were -- for instance, there were 22 pages of

2    handwritten notes from a claims file or from a file that we've

3    never seen that were produced that day.  We don't really know

4    what else is out there.  There's also one CPS document clearly

5    that should have been produced that had been identified by

6    Fidelity in a privilege log, and all it said was -- what was

7    the proper term?

8            MR. HALL:  "Note by Mark Dickhute."

9            MR. WUNDERLICH:  It said, "Note by Mark Dickhute."

10   It didn't identify it as a CPS document.  Well, in fact, it

11   was a brief that had been attached to CPS, but when they

12   produced the CPS documents, that wasn't in there.  So we

13   clearly believe there's a good faith basis that we'll

14   determine -- that should allow us to determine whether or not

15   these things have been removed from the system, what's been

16   looked for, and we truly believe that people with knowledge

17   about the underlying system and network can access this

18   information.

19           You know, what's also glaringly missing from any

20   affidavit from Fidelity is no discussion about having a

21   conversation with any information -- you know, CFO or CIFO or

22   whatever they call them, the company information person.

23   There's -- you know, they have over 10,000 employees, Your

24   Honor, and clearly, they've got this all networked.  Their own

25   claims handbook says this is the bible, you must do it this

1  way, the information is either found in the CPS system or it's

2  found in a hard file.  Well, we've never been produced, quote,

3  "a hard file."  We've been given these documents that are

4  called "As organized file."  We truly believe that these --

5  and their own manual, claims manual, says they're supposed to

6  attach these things and keep these things in the CPS system.

7  Now they claim they don't do that.  Well, then it should be

8  someplace else, and it's our belief that those things were in

9  the CPS system and somebody removed them.

10          THE COURT:  Okay.  Now, there is -- you've made the

11  claim that there were documents that should have been produced

12  last September that were not produced until January.

13          MR. WUNDERLICH:  A year and a half ago, Your Honor.

14  But not just last September.  A year and a half ago.

15          THE COURT:  Okay.

16          MR. WUNDERLICH:  The September before.  May and

17  September of -- our first request for production was directed

18  to them on May 11th, 2011, and we specifically asked for the

19  claims file for the policy and any old documents related to

20  any evaluation of coverage under the policy, which would have

21  included all these documents.

22          THE COURT:  All right.  And how was it that you came

23  to receive those documents in January?

24          MR. WUNDERLICH:  Judge, what happened was we took the

25  deposition of Mark Dickhute.  Let me get the date so I get

1  this right.  We took Mr. Dickhute's deposition on May 23rd of

2  2012.  No CPS document had been identified, and no Major

3  Claims Report had been identified.  During my questioning of

4  Mr. Dickhute, I asked him specifically about how he reported

5  and what he did, and in his deposition, he identifies -- do

6  you have that?  Do you want to pull that up, Steve, if you

7  could, that slide?  If you could give us just a minute, Your

8  Honor, I'd like to show you the slide.

9       We asked Mr. Dickhute and Mr. Perna, the two people

10  that were handling the claim, a couple of questions.  One was,

11  "How do you maintain files, and what do you do?"

12       You just had it a minute ago, Steven.

13       And Mr. Dickhute says, "Well, I have a Major Claims

14  Report."  Well, that had never ever been disclosed to us, Your

15  Honor, and that was the subject of a previous motion we

16  brought to the Court, and you'll see, "How do you communicate

17  with your supervisors if it didn't go through CPS system?"

18  And we had just found out about the CPS system.

19       "Normally, by telephone, and there were reports that

20  would be prepared on a monthly basis and submit them.

21       And how do you identify these reports?

22       They were called Major Claims Report.

23       And who would they be submitted to?

24       On a monthly basis, to our supervisor."

25       And Mr. Dawley has also talked about those reports

1 that he submits to his supervisor.  He says he does those

2 electronically.

3 Well, again, those have not been produced.  There

4 have been no emails produced.  There have been no Major Claims

5 Reports from any supervisors that have been produced, and

6 there are a couple of Major Claims Reports in the key period

7 of time.  There are three of them that all we've been given

8 are excerpts.  We haven't been given the entire reports,

9 notwithstanding the Court's order, and the Court had entered

10 an order specifically on this issue in her order.

11 Pull up the order, Steven, please.

12 In your August 17th order, Your Honor, you required

13 them to produce the Major Claims Reports and all the CPS

14 materials at that point in time, and so after that date --

15 and, of course, that was after discovery had closed -- they

16 began producing some of this information, and we continued to

17 work with them to try to obtain the additional information.

18 We were told that we had all the CPS information at one point

19 in time, and in fact, we hadn't been given all the CPS

20 information.

21 Go to the example, Steven, of the document from Mark

22 Dickhute.

23 Your Honor --

24 Go back one, Steven.

25 It said it was listed in their privilege log as a

1   note by Mark Dickhute, so that doesn't even say CPS, but the

2   Court had ordered them to produce them in your August 17th

3   order, and then you also told them that they should continue

4   looking for this, and you instructed them to -- they

5   represented to the Court that they were working with an

6   e-discovery specialist, who turned out to be Mr. Rini.

7         They then -- we then find out in January -- go ahead

8   to the next slide -- which was produced on January 7th,

9   2013 -- this document here, which was clearly part of the CPS

10   system.  Now their response is, "Well, you have the

11   information similar to that in what we've produced to you,"

12   but that begs the question.  This document -- do you see where

13   it says, "Brief"?

14         THE COURT:  Yes.

15         MR. WUNDERLICH:  That's specifically referenced in

16   what was provided in a number of these things, but this

17   document wasn't provided.  So either it was removed from the

18   system or it was located someplace else, and it's critical in

19   one respect because the entry itself says, "On November 3rd,

20   2010, instructed Martin Blanchard" -- that was the attorney

21   that was hired by Fidelity -- "that no settlements will be

22   entered into by Fidelity in light of the declaratory judgment

23   action and coverage determination.  My settlement offers --

24   any settlement offers should be sent to the insured for their

25   handling."

1        Now, clearly, had we had that when we took

2    Mr. Dickhute's deposition, I could have inquired of him about

3    what the meaning of "coverage determination" was, and in fact,

4    in his deposition, he did talk about "coverage determination."

5    He had made one, is what he said, before he even filed this

6    lawsuit.  So, clearly, we should have had the opportunity to

7    depose him about these things, and we don't even -- we don't

8    even see this until January 17th, and clearly, the Court had

9    ordered that this be produced.

10        So I'm not sure what else I can say on that issue.

11    I've kind of lost track of your initial question, Judge.  I

12    apologize.

13        THE COURT:  No.  That's all right.  Well, when --

14    when this document and any other documents were produced in

15    January, what was -- was any explanation given for not

16    producing them sooner?

17        MR. WUNDERLICH:  The answer was, Judge, "You've been

18    provided information of the same ilk."  Now, that's not

19    responsive under the federal rules, to my knowledge.  Okay.

20    You can't choose and pick what you get to give to us.

21        THE COURT:  So -- okay.  I guess I'm -- and maybe

22    I'll save this question for the -- for Fidelity because it

23    doesn't make sense to me.  If they didn't feel that these

24    documents needed to be produced earlier, why did they produce

25    them at all.

1          MR. WUNDERLICH:  That's a good -- Judge, what

2    happened was we'd been complaining for months or probably a

3    year about having the claims file because -- let's go back to

4    their CPS Slide 25.

5          Your Honor, in their own claims handling book, they

6    say basically that at all times that claims are received, all

7    incoming claims are logged into CPS.  From this point on, the

8    system will track claim status, reserve information, claims

9    payment, and claims resolution information.

10          Go to the next page, please.

11          They also say that, under (c) the duties of the

12    claims administrator, "Since CPS is Fidelity's sole system for

13    tracking and reporting claims-related data, it is absolutely

14    essential that all claims administrators make use of this

15    system in a consistent way and each administrator must adhere

16    to the following CPS procedures for each of these claims as

17    are listed below."  So you would think you would find it

18    there, but what Fidelity's position is -- "Well, we didn't

19    really use the CPS system.  We kept this stuff either in the

20    CPS system or in the hard file."  And so we've said all along,

21    "Where is the hard file?"

22          Go to the timeline, please, Steven.

23          Your Honor, it's kind of -- you can't really read

24    that, Your Honor.  I apologize.  We have a blowup.

25          Why don't you put it over here.

1    Your Honor, just to kind of visualize this a little

2    bit, we had asked for the claims file back on May 11th of

3    2011.  They filed a privilege log, their first one, on

4    9-15-11.  It doesn't have these Major Claims Reports on it.

5    It doesn't have the CPS on it other than some vague

6    description that you wouldn't know it's CPS.

7         Interestingly, Mr. Dawley receives the paper file on

8    November 21st, 2011, that came from Mr. Dickhute, the one we'd

9    been asking for.  Now, that's not produced until we get back

10   into -- December of 2012 is when that's finally produced to

11   us.  Well -- and what is produced to us is a file that they

12   say, "As organized.  You can come out and look at it.  It's an

13   'As organized' file, and we'll also give you this listing of

14   documents that are in there."  So we made arrangements to go

15   out there.  We thought they should have produced the whole

16   file.  Whether it's in fact the claims file as requested, I

17   still don't know to this day, but they produced the file, so

18   we went out there, and there are a number of things in there

19   that they now try to add to another privilege log.  They keep

20   trying to add to another privilege log, and so that's how we

21   found out about a number of things, and then we protested

22   about a number of these things when we looked at the privilege

23   log and said, "That's not privileged under the Court's order;

24   you have to give that to us."  And that's how we found the one

25   CPS document is just by pushing them, and this was at the same

1 time that we were filing the summary judgments in this case,

2 Your Honor, well after discovery has been completed, well

3 after we took the deposition of Lance Perna and Mark Dickhute,

4 the two major claims handlers in this matter.

5      So I mean we've not had the opportunity to take

6 meaningful depositions in this case, and their excuse is,

7 "Well, you had similar information."  Well, with all due

8 respect to Fidelity on that, Your Honor, that's not the test

9 as I understand it.  The test is you're supposed to disclose

10 things and you're supposed to provide things.  If you have a

11 legitimate basis for it, then you need to identify it so it

12 can be explored with the Court by way of an appropriate motion

13 or you either waive it or you produce it.  You don't hide it

14 from people.

15      THE COURT:  Okay.

16      MR. WUNDERLICH:  And, Your Honor, we still haven't

17 been provided Dawley's paper file either, the now claims

18 handler.  I mean clearly in a case where you have tortious

19 interference, when you have vexatious refusal and you have a

20 coverage determination, the cases are clear that that is

21 clearly discoverable, and we should be entitled to those

22 things.

23      THE COURT:  All right.  Okay.  Thank you,

24 Mr. Wunderlich.  I think those are all the questions I have

25 for you at this point, and I'd like to hear from Fidelity, and

1  I may have some --

2        MR. WUNDERLICH:  Your Honor, the only thing I would

3  say in parting also is Mr. Whitledge's affidavit clearly lays

4  out the difference between his experience and Mr. Rini's, who

5  doesn't really have any, and how he would go about doing this,

6  and I'm happy to let him explain to you in response to your

7  earlier question how he would basically shadow over somebody

8  in looking at the documents.

9        THE COURT:  Okay.  Thank you.

10        MR. WUNDERLICH:  Thank you.

11        MR. BRINER:  Good morning again, Your Honor.

12        THE COURT:  Good morning.  Go ahead, please.

13        MR. BRINER:  Thank you, Your Honor.  First off, we do

14  appreciate the exception the Court's made in allowing us to be

15  here today and to present some oral argument on what we feel

16  is a far-reaching request.

17        The first thing I want to note is I think it seems

18  like there's two separate motions being rolled up here into

19  one, and I kind of want to dissect those for the purposes

20  of -- of my remarks.  Captiva is moving to compel the

21  production of certain documents that have been withheld on

22  various bases.  It's also moving, prosecuting a motion for

23  sanctions, and that would be Mr. Whitledge coming in and

24  inspecting systems, and I think that's an important

25  distinction to keep in mind because the motion to compel --

1   Captiva spends a lot of time talking about documents for which

2   the Court hasn't entered a discovery order, and -- and the

3   nonproduction of those documents, I don't think, under Rule

4   37(b) come into play on the discovery sanctions because that

5   is triggered by someone having a discovery order of the Court

6   entered and then violating it or disobeying it.  So on the

7   motion to compel issue, I don't want to waste the Court's time

8   with that.  We've gone through that step-by-step in our

9   pleadings, and to explain why the documents that we're

10  withholding we're withholding, we've also brought a set of

11  those documents with us that we can submit for in camera

12  review if the Court sees fit.

13          What is more concerning, as the Court kind of, I

14  think, gleaned from the pleadings, is the sanctions aspect of

15  the motion and their request to inspect our systems by

16  Mr. Whitledge, and it seems to me that's got to come down to

17  showing -- to get that, to even have that in play, okay, they

18  have to show a violation of one of these orders that the Court

19  entered last -- last summer and fall, August of 2012 when the

20  Court said produce the CPS data and the Major Claims Reports

21  and then November when the Court said -- in November, the

22  Court had heard from Captiva about some questions about this

23  data and how it could be presented and what else there might

24  be, and that's -- and November is when the Court came back to

25  us and said, "Okay.  Confer with your e-discovery specialist

1   and then report back."  Okay.  To get any sanction at all,

2   they have to show that we violated those, okay, and -- and we

3   don't think we have, and we think the record shows that we

4   haven't, and if I could jump ahead to one of the questions you

5   asked of Mr. Wunderlich that you said you might reserve for

6   me, which is why in January did we produce a hard copy of

7   this -- it said, "CPS note by Mark Dickhute."  I jotted down

8   the date.  I think it's November 7 of 2010.  Well, that entry,

9   whatever it said, it recited some conversation with Martin

10  Blanchard and no settlements will be entered, something like

11  that.  That's a hard copy that someone at Fidelity -- I guess

12  Mark Dickhute; I don't know -- printed out and put in the hard

13  file.  Okay.  We withheld that from production, and then when

14  the Court told us to produce CPS data -- we originally

15  withheld it from production, and then when the Court said,

16  "Produce all the CPS data," we produced all the CPS data, and

17  I think I've talked to Mr. Wunderlich about this.  It's that

18  that very entry that's set forth there in a hard copy that's

19  been printed out and placed in the file is on the summary of

20  entries and briefs that we produced back in August when the

21  Court told us to.

22          So as I understand their complaint, it's not that

23  they didn't know that Mark Dickhute entered a note on

24  November 7 of 2010 saying no settlements but that they hadn't

25  seen a hard copy of it in the form that existed in our file.

1   Now, and the reason --

2           THE COURT:  And you didn't think that they were

3   entitled to that?

4           MR. BRINER:  It's the same information, Your Honor,

5   and so when we produced the full body of CPS data when the

6   Court told us to, we produced that very same thing.  Now,

7   obviously, I didn't -- we didn't go back at that point and

8   say, "Well, what is in the hard file, that may be a printout

9   of what is in CPS," but in terms of having access to that very

10  information, we provided that timely in response to the

11  Court's order.

12          THE COURT:  Okay.

13          MR. BRINER:  Well, certainly, I think they're

14  entitled to it once the Court ordered that they're entitled to

15  it, and we gave that information to them.

16          THE COURT:  Okay.  You know what?  You all are

17  probably very smart people, maybe a lot smarter than I am, but

18  I just want to kind of cut to the chase here.  There's been a

19  lot of discovery disputes in this case, and it's troubling to

20  me to see that because I don't know why a bunch of bright

21  people can't figure this out.  Now it's gotten to the point

22  now where one side doesn't trust the other, and maybe there's

23  grounds for that, maybe there isn't, but at some point, this

24  case is either going to go to trial, there's going to be a

25  settlement, or there's going to be a ruling by the Court.

1   Those are the only three possibilities that I'm aware of.  So

2   until one of those things happens, you're going to have to get

3   along.  You're going to have to figure out a way to provide

4   information to each other in a way that makes sense.  It is

5   very troubling to me when I hear about documents being

6   produced piecemeal.

7           MR. BRINER:  I'm sorry.  The last word, ma'am?

8           THE COURT:  Piecemeal.

9           MR. BRINER:  Oh, thank you, Your Honor.

10          THE COURT:  That's very, very troubling to me, and

11  I'm going to be honest with you.  Some of the stuff that has

12  happened here is making Fidelity look like the bad guy.  I'm

13  not saying you are, but that's how it's looking.

14          Now let me ask you this.  Mr. Whitledge wants to

15  conduct an inspection, which I hope if that inspection is --

16  is authorized and it's completed, that that will put

17  everything to rest here, that Captiva will have had the

18  opportunity to have their person look at the system and

19  determine whether everything's been produced or not, and that

20  will be the end of that.

21          What is Fidelity's concern about having Mr. Whitledge

22  conduct an examination with all of the restrictions on

23  protecting confidential information and the like?  What is the

24  problem if, by doing that, this could put all of this, all

25  these disputes to rest?

1    MR. BRINER: Well, and I appreciate the Court's

2 comments, and your message is received, Your Honor. I will

3 say that that's not what they've asked for in their motion.

4 Obviously, there's no limitations on what they've asked for in

5 their motions. The concerns about providing Mr. Whitledge

6 with any access to the system would be that there are -- it

7 would -- without the proper limitations in place, there would

8 be access to personally identifiable information for

9 thousands, tens of thousands, maybe hundreds of thousands of

10 other insureds, other banks, other loans, and things like

11 that, and that's very disturbing to Fidelity as the storer of

12 that information.

13    THE COURT: Is there a way to prevent him from having

14 access to that information? He shouldn't have access to

15 information concerning any other insured. That's --

16    MR. BRINER: Right.

17    THE COURT: -- you know, my feeling, and I don't

18 think that Captiva is interested in anybody else's insurance

19 or coverage, so --

20    MR. BRINER: With respect to the Court thinking that

21 I'm a bright person, much like Mr. Wunderlich, some of these

22 high-level IT issues are beyond me as well, but I did speak

23 with Mr. Rini about that, that kind of topic, in anticipation

24 for today's hearing, and he said that not knowing what Captiva

25 wanted because the pending motion says -- asks for everything

1   without limitation, it would be possible to set up a web

2   conference or a webinar, something like that, exploratory with

3   Mr. Whitledge to show him, hopefully answer the questions he

4   has and show him what's out there if -- if the request is

5   limited and the Court's interested in giving a tailored, a

6   tailored fit like that.

7            THE COURT:  I'll be honest with you.  I have some

8   concerns about allowing someone unlimited, unfettered access

9   to your computer systems.  I don't like that notion at all,

10  especially since it may be that everything that is required to

11  be produced has been produced, so -- but at the same time, I

12  mean you've got to -- I mean you've got to look at it from

13  their point of view.  Some of the ways that this information

14  has been coming to the Defendant is very -- would -- would, I

15  think, reasonably give someone cause to think that maybe

16  there's more out there or maybe something isn't being produced

17  or -- or there's some kind of word game going on that -- that

18  they're not part of.  So I mean I understand the -- the reason

19  that they've come to this point, and I -- I think that their

20  request may not be unreasonable, an unreasonable one under the

21  circumstances.  My only -- my concern is -- not my only

22  concern but one of my concerns is that if this is allowed that

23  it be tailored in some way -- and I don't know how to do that

24  because I -- I -- I wouldn't -- I mean I know how to turn on

25  my computer, I know how to access my email and do a few other

1  things, but when it comes to an actual inspection of a

2  computer -- and Mr. Whitledge did provide some information in

3  his affidavit, but I'm sorry, I'm just not that -- I'm not

4  that advanced.

5        MR. BRINER:  From reading -- from reading the cases

6  on this type of topic, Judge, I think I've seen one or two

7  instances where the Court says, "Well, I'm going to allow a

8  tailored -- some kind of tailored access, but I'm going to

9  tell the parties to confer and come up with the boundaries and

10  things like that."

11        THE COURT:  Well, that was my -- where I was sort of

12  going because you mentioned -- well, I don't know if Mr. Rini

13  is the person that would set up this webinar thing or if

14  someone else within Fidelity, but it -- or someone outside of

15  Fidelity if you have your own expert, but it seems to me that

16  both sides need to get together and try to figure out how to

17  do this.  You know, I don't want to see another discovery

18  motion.  You know, I would like you all to figure out a way to

19  put all of this to bed.  I mean you're not getting anywhere by

20  filing all these motions other than wasting your client's

21  money.  I don't know.

22        So here's -- here's what I propose that you do -- and

23  you tell me if this makes sense or if it makes no sense --

24  that -- that the two of you, Mr. Whitledge and whoever from

25  Fidelity's side, get together and figure out a protocol for an

1    inspection.  Does that make sense?

2         MR. WUNDERLICH:  May I approach for the moment?

3         THE COURT:  Yes.

4         MR. WUNDERLICH:  Your Honor, the problem I have with

5    that is -- pull up Mr. Rini's résumé.  This is the man they've

6    represented to the Court and to Fidelity as being an

7    e-discovery specialist.  They've done that in pleadings with

8    the Court.

9         THE COURT:  I have a couple of affidavits from

10   Mr. Rini.

11        MR. WUNDERLICH:  Well, let's find the pleading where

12   they've said -- an email and a pleading where they've called

13   him an e-specialist, e-discovery specialist.

14        Your Honor, if you'll look at what's in front of you

15   now, this is an email from Shawn Briner to Steven Hall and

16   myself on September 12th, and this was after the Court had

17   entered an order, and we've continued to try to work with them

18   on this.  He says, "We continue to work on the issues that

19   were raised in your 9-7-12 letter.  We are in contact with an

20   e-discovery specialist to figure out what else can be done

21   with respect to information in CPS, and they know that they're

22   working under a very short time deadline."  And this is after

23   the Court entered its August 17th order telling them to report

24   to the Court using an e-specialist, e-discovery specialist.

25        Now let's go to Mr. Rini's résumé.  The man they put

1   up is Mr. Rini.  It's hard to -- it's a little -- can you make

2   that a little larger, Steven?  Yeah, there you go.

3           This is his résumé that's online.  There's nothing

4   on -- he's an actor, Your Honor, who's also Vice President of

5   Special Projects for Fidelity.  If you look at the bottom

6   line, he's fluent in legalese.

7           Go to the next page, Steven, 59.

8           Okay.  This is his LinkedIn profile.  He says

9   basically he's an actor and he's also an Assistant Vice

10  President at Fidelity National.  If you look at his

11  affidavits, Your Honor, that he filed with the Court, there's

12  no indication that he even knows what the platform is that is

13  the basis for Fidelity's computer information, and what I'm

14  concerned about here is -- is we're going to end up getting

15  Mr. Rini here who doesn't really understand the system, and

16  Mr. Whitledge can -- if the Court would indulge him for just a

17  couple of minutes, he'd be happy to tell you to what type of

18  person he needs to speak with.

19          THE COURT:  Okay.  Well, obviously, if this

20  inspection is allowed, Mr. Whitledge will be working with

21  someone from Fidelity, and --

22          MR. WUNDERLICH:  My only point is --

23          THE COURT:  -- I don't know who that person -- it

24  might not be Mr. Rini.  It might be someone else.  My -- my

25  point is this, and I don't know who that person would be, and

1 I don't know who Mr. Whitledge thinks that person's

2 qualifications ought to be or even if Fidelity has someone

3 that meets those qualifications.

4          MR. WUNDERLICH:  They do, Your Honor.

5          THE COURT:  Okay.  Well, isn't that something that

6 you all can work out?

7          MR. WUNDERLICH:  We can as long as -- my point of

8 making -- my reason for getting back up here and making that

9 point -- I don't want to be in a position where here we're

10 faced with someone who says, "When I push the buttons, it

11 doesn't show up."  We need somebody that knows about the

12 internal systems that can speak with Mr. Whitledge, so that

13 they're talking about the platform basis upon which the

14 systems are found, and so as long as the Court's order is

15 clear in that respect, then I'm fine with that, Your Honor,

16 and we're happy to try to do that.

17          THE COURT:  Okay.  Mr. Briner, I mean surely you all

18 have someone who meets those qualifications.

19          MR. BRINER:  Your Honor, I'm sure we do.  I mean

20 there has to be some bright lines here, and I think we should

21 be able to select our own designee in that capacity.

22          THE COURT:  Right.

23          MR. BRINER:  And if that person can't answer

24 Mr. Whitledge's questions, then there might be an issue, but,

25 you know, I think this is -- we would just like some bright

1   lines as we enter into this about it being limited to the

2   information regarding Captiva's claim, for example.  Is that

3   something -- what I hear the Court saying -- and I know you

4   don't want to negotiate this right here on the record.

5          THE COURT:  No.  I think there ought to be

6   limitations on --

7          MR. WUNDERLICH:  Your Honor, we're not asking for

8   anything other than information that pertains to this claim --

9          THE COURT:  Right.  I understand that.

10         MR. WUNDERLICH:  -- including emails between

11  supervisors, et cetera.

12         THE COURT:  And I think that to the extent that

13  there -- there is a possibility, however remote, that

14  confidential information has to be disclosed in order to get

15  you what you need, I -- that can be dealt with through a

16  confidentiality agreement or something that would bind

17  Mr. Whitledge or prevent him from disclosing that information

18  except within the context of this litigation, and I -- I mean

19  this kind of stuff is done all the time, so I don't think

20  that's going to be a problem for you, but I will say this.

21  The whole idea is to get to the bottom of this, and if -- if

22  there are no documents, there are no documents.  If there are

23  and they should be disclosed, then they will have to be

24  disclosed, but once -- my hope is that once this process is

25  over that you all will be able to focus on something other

1  than these little discovery squabbles and that you'll be able

2  to move forward with the case, and I don't -- when I say

3  "little discovery squabbles," I'm not trying to minimize the

4  importance of these disputes because I understand they are

5  important, but in the whole scheme of things, they're holding

6  you back, they're keeping you all from moving forward in this

7  case, so -- and I don't want to -- I would like to see this

8  case resolved at some point.  I mean it's -- I think we all

9  would.  I hope we all would.

10       So I -- one other thing I will say is this.  I think

11  it is incumbent on both sides to work in good faith, not just

12  the lawyers but the parties as well.  Mr. Whitledge has a lot

13  of qualifications for what he is being proposed to do, and

14  he's going to have to work with someone who has the

15  qualifications to do the kind of searching that is going to

16  have to be done, and I don't know who that person will be, but

17  if it's someone whose qualifications are on my level, that's

18  not going to be good faith.

19       MR. BRINER:  Understood.

20       THE COURT:  Okay.  All right.  So how soon can you

21  all get together and work out this protocol for conducting the

22  search?

23       MR. WUNDERLICH:  Promptly, Your Honor.  We're

24  prepared to do that today.

25       MR. BRINER:  Well, we don't have our designee with us

1    here today unless Mr. Dawley has gained a lot of knowledge as

2    we've sat here about the inner workings, so we're glad to --

3    we can speak with Mr. Whitledge today, Your Honor --

4            THE COURT:  All right.

5            MR. BRINER:  -- and get an idea and then confer with

6    our folks.

7            THE COURT:  I think that would be a good idea.  Okay.

8            And I will -- here's what I'm going to do.  I'm going

9    to give you all -- oh, and where would this inspection take

10   place?  Do you all know?

11           MR. WUNDERLICH:  Your Honor, I'm assuming it would be

12   in Florida, but I don't know that for sure.  Fidelity would

13   have to tell us.  I would assume their mainframe computers --

14   do you know?

15           He believes probably Jacksonville, Your Honor.

16           THE COURT:  Okay.  All right.

17           MR. BRINER:  And, Your Honor, I don't -- we don't

18   know the answer to the question.  We're going to have to find

19   out more about what Mr. Whitledge's contemplated protocol

20   would be and then answer those questions.

21           THE COURT:  All right.  So why don't I do this, and

22   if this is too much time or not enough time, let me know.  My

23   plan is to give you all 20 days to work out a protocol for --

24   that would allow for the inspection of the Plaintiff's

25   computer system, and I will authorize or appoint Mr. Whitledge

1  to conduct that inspection on behalf of the Defendant.  So to

2  that extent, the motion, the Defendant's motion, is granted.

3  I will deal with the other issues raised in the motion later

4  if I need to, but I am going to authorize Mr. Whitledge to

5  represent the Defendant in this inspection, and I'll leave it

6  up to the attorneys and the parties to work out a protocol

7  that would allow for the inspection to be done, taking into

8  account the need for protecting confidential and privileged

9  information.  So do you think that's sufficient time or do you

10  think you need -- you can do it in less time than that?

11         MR. WUNDERLICH:  I don't know about less time, Your

12  Honor.

13         THE COURT:  Okay.

14         MR. WUNDERLICH:  I have a federal jury trial or not

15  jury -- a federal trial scheduled for May 20th in Ohio, so I'm

16  in a little bit of a bind in terms of my personal time, so 30

17  days may be more realistic, Your Honor --

18         THE COURT:  Thirty.

19         MR. WUNDERLICH:  -- in terms of getting the protocols

20  all put together.

21         MR. BRINER:  We're just talking about the protocol,

22  not the completion of the project itself?

23         THE COURT:  Yes.

24         MR. BRINER:  Okay.  We -- sure.

25         MR. WUNDERLICH:  Because they've got to find

1  somebody, and we've got to find -- Mr. Whitledge lives in

2  Washington, DC.

3          THE COURT:  Right.

4          MR. WUNDERLICH:  So we've got -- this meeting may

5  have to be in person, I would think.

6          THE COURT:  All right.  Well, I'll give you 30 days,

7  and once that is done, I would like you all to let me know

8  what you have agreed to, and if there are any protective

9  orders that need to be entered, you can submit proposed

10 protective orders for me to review, and after you set up the

11 protocol, then I will establish a new deadline --

12          MR. WUNDERLICH:  Your Honor --

13          THE COURT:  -- for --

14          MR. WUNDERLICH:  -- I would anticipate they could

15 probably give us some estimate as to how much time they need

16 when they set up those protocols, and we would anticipate

17 getting that from them if that's okay with you.

18          THE COURT:  Yeah, that's fine.  In fact, I would like

19 to know that when you report to me in 30 days, how much time

20 it will take to do the actual inspection, and then I will

21 establish a deadline for completing that.

22          MR. WUNDERLICH:  Thank you, Your Honor.

23          THE COURT:  Okay.  Okay.  Anything else?

24          MR. FRITZLEN:  Judge, I just had one question, and

25 I'm not asking for this relief, but I do know that we have a

1    trial set on June 17th.  We're now at April 23rd.  With 30

2    days, are we still going to try to meet the June trial

3    deadline?  That's fine.  I'm just asking.

4         THE COURT:  I don't see how that's possible.  I mean

5    I would like to, and if you -- I mean if you all want to go to

6    trial in June, I mean I've got the time blocked off, so I mean

7    I'm happy to do it, but I don't think you all are going to be

8    ready.  Do you think so?

9         MR. FRITZLEN:  I guess it's really a question

10   addressed to Rick.  I'm not asking for a continuance, and

11   we'll be ready to meet whatever trial deadline.

12        MR. WUNDERLICH:  Your Honor, I don't think there's

13   any way given this inspection.  I don't know what we're going

14   to find, first of all.

15        THE COURT:  Right, right.  Well, I will take this off

16   the trial docket for June 12th or whenever it's set, and when

17   I know more about this inspection, I will reset it.

18        MR. WUNDERLICH:  Thank you, Your Honor.

19        THE COURT:  Okay.  And I'll -- I will make every

20   effort to try to remember to give you all some input into a

21   new trial date, so that I don't have to reset it again.  Okay.

22   All right.

23        MR. BRINER:  Thank you, Your Honor.

24        THE COURT:  Thank you all.  We're in recess.

25       (Proceedings concluded at 11:26 a.m.)

CERTIFICATE


       I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

       I further certify that this transcript contains pages 1 through 33 inclusive.

       Dated at St. Louis, Missouri, this 9th day of June, 2013.


_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter