**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, SUCCESSOR BY-MERGER TO LAWYERS TITLE INSURANCE CORPORATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:10-cv-01890-CEJ |
| vs. | ) ) ) | |
| CAPTIVA LAKE INVESTMENTS, L.L.C., | ) ) | |
| Defendant. | ) | |

## DEFENDANT CAPTIVA'S TRIAL BRIEF

### INTRODUCTION

What remains of this case—after the direction afforded by the Court in its Order on the summary judgment motions—concerns the express right of an insured ("Captiva") under a lender's title insurance policy ("Policy") to obtain coverage from the insurer ("Fidelity") for "loss and damage" caused by the filing of mechanic liens ("Liens").   This includes Captiva's right to a competent and customary defense when Fidelity promised to defend against the "loss of damage" caused by the Liens.  Fidelity breached that promise when it went behind Captiva's back and imposed limitations on the "scope" of the promised defense, exasperating the "loss or damage" that was most manifest in Captiva's inability to sell the property or to obtain financing for the project.  This case also concerns the integrity of Captiva's relationship with its counsel. Fidelity violated and tortiously interfered by wrongful conduct that included enlisting the assistance of Captiva's "defense" counsel in Fidelity's efforts to deny coverage.  In addition to Fidelity's liability in contract and tort, Captiva also seeks to hold Fidelity accountable for its vexatious conduct pursuant to Section 375.296 of Missouri's Revised Statutes.

## FACTUAL BACKGROUND

### *The Policy*

The title Policy expressly insures against "loss or damage" to the insured's title.  Policy (available at Dkt. No. 2-1), at 7.  The insurer must provide coverage when any "loss or damage" (not otherwise excluded) was "sustained or incurred by the insured by reason of" one or more of eight specified events.  When any one of the eight specified events occurs, the Policy provides coverage for the resulting "loss of damage".  Set out in its totality, the insuring provisions of the Policy state as follows:

> [Subject to all exclusions and exceptions, Fidelity] Insures, as of Date of the Policy shown in Schedule A, against loss of damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by insured by reason of:
>
> 1.  Title to the estate or interest described in Schedule A being vested other than stated therein;
> 2.  Any defect or lien or encumbrance on the title;
> 3.  Unmarketability of title;
> 4.  Lack of a right of access to and from the land;
> 5.  The invalidity or unenforceability of the lien of the insured mortgage upon the title;
> 6.  The priority of any lien or encumbrances over the lien of the insured mortgage;
> 7.  Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material: (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
> 8.  The Invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clean of all liens.
> The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the

2

> Insured mortgage, as insured, but only to the extent provided in
> the Conditions and Stipulations.
> IN WITNESS WHEREOF, [FIDELITY] has caused it corporate
> name and seal to be hereunder affixed by its duly authorized
> officers, the Policy to become valid when countersigned by an
> authorized officer or agent of the Company.

*Id.* The coverage afforded by the express language of the Policy confirms that the insured obtained title insurance that would redress the "loss of damage" caused by the Liens.

The background to the procurement of the Policy concerns the construction of luxury condominiums and a marina on the shores of Lake of the Ozarks, called the Majestic Pointe Development ("Project").  In March of 2006, the developer executed a promissory note to obtain $21,280,000.00 in financing from National City Bank of the Midwest (which subsequently became known as National City Bank and is referred to herein as "NCB").  To obtain the loan, the developer also executed a deed of trust ("Deed of Trust") in favor of NCB, and NCB required the procurement of a title insurance policy that would insure the priority of its interest and protect the bank from "loss of damage" to its security interest.

Prior to closing on the loan, NCB's attorney—John McNearney of the law firm Blackwell Sanders Peper Martin, L.L.P.—sent a letter to Fidelity's title agent, Guaranty Land Title Insurance, Inc. (a company within a consortium of title companies known as the LandChoice Company L.L.C., which will be referred to herein as "LandChoice") instructing that a lender's title insurance policy must be obtained as a condition of the loan's closing and had to be in an amount equal to the loan ($21,280,000.00).  Specifically, McNearney instructed LandChoice that "[t]he Lender's Title Policy shall not have an exception for mechanic's liens." McNearney Ltr. (available at Dkt. No. 2-2), at 3 (¶5).  To underscore his instruction, Mr. McNearney enclosed a pro forma policy with his letter that consisted of the standard ALTA form

loan policy on which McNearney crossed-out the standard exception for mechanic liens. [1]  *Id.* at 4.  This means that the Policy would have to insure for the "loss or damage" to NCB's interest in the Project that was caused by mechanic liens.   Most importantly, neither the Policy that Fidelity issued on March 15, 2006 nor a modification endorsement[2] issued on October 25, 2007 contained an exception to coverage for the "loss or damage" caused by mechanic liens.

*The Claim*

In 2008, the Liens were filed against the Project that caused "loss or damage" under the Policy.   NCB sold the loan to Captiva in 2009, assigning its rights to Captiva under various documents, including the Deed of Trust[3] and the Policy.   By a letter dated August 3, 2009, Captiva made a claim under the Policy and demanded that Fidelity defend Captiva against the Liens and to indemnify it from any resulting loss or damage.[4]   On October 1, 2009, Fidelity

---

[1] Depending on which counts in Fidelity's Complaint that the Court allows Fidelity to present evidence, Mr. McNearney's letter and his marked-up pro forma policy could have further evidentiary significance which includes the following:

- First, in Schedule B, Section 1 ("Requirements"), McNearney crossed-out a requirement appearing in the form policy, which would have required: "Payment to or for the account of the grantor or mortgagors of the full consideration for the estate or interest to be insured."  The practical effect of deleting this requirement is that NCB was not required to fully fund the loan as a prerequisite of obtaining coverage under the Policy.

- The second action of potential significance concerns something that Fidelity and its agent did not do. As stated in his closing letter, McNearney instructed that the Policy would have to comport to his pro forma policy, arguably "including all endorsements" that he included with the pro forma policy. Among the endorsement included by Mr. McNearney was an endorsement authorizing the issuance of pending disbursement endorsements (or PDEs).  Fidelity and/or its agent could have issued a policy that included this endorsement but it did not do so.  If included in the Policy (and it was not), this endorsement could affect Policy terms.  But without a policy endorsement authorizing the issuance of PDEs, a PDE may not be used to reduce or otherwise limit the coverage set forth in a policy.

[2] The Modification Endorsement increased the amount of coverage from $21,280,000.00 to $22,380,000.00 in order to account for additional funds that NCB agreed to loan to the developer to complete the Project (an amended deed of trust securing NCB's investment was similarly executed and recorded).   The issuance of this Modification Endorsement did not affect—consistent with Mr. McNearney's instruction—the coverage provided in the Policy for mechanic liens.

[3] Pursuant to the Deed of Trust, Captiva subsequently foreclosed on the Property and became the owner.

[4] On August 2, 2010, Captiva reasserted its claim after it incurred specific "loss or damage" on account of an attempted sale of the Project that failed due to the existence of the Liens (and Fidelity's decision not to "insure over" the Liens).  Captiva's letter specified that the "loss or damage" caused by the Liens now demonstrably included marketability.

agreed to fully defend against the Liens subject to a reservation of rights and retained the law firm of Sauerwein, Simon & Blanchard, P.C. ("SSB") to defend Captiva against the Liens. Fidelity stated to Captiva:

> [SSB] will defend the insured in that action and has ***all*** attendant fiduciary duties related to such representation, ***including the attorney-client privilege***. . . . [SSB] has been hired ***solely*** to defend the insured's interest in regards to the mechanic's lien litigation. This representation does not encompass legal advice or opinions regarding coverage issues under the policy.

Perna Ltr. (available at Dkt. No. 2-5), at 2 (emphasis added). Fidelity also advised Captiva that it "may retain independent counsel to assist [in making the coverage determination]" anticipated by the reservation of rights, and Fidelity retained Jay Levitch of the Stolar Partnership to provide a coverage opinion. *See id.*

*The "Defense"*

At Fidelity's instruction, SSB did not provide a customary or competent defense for Captiva, and Fidelity interfered with Captiva's attorney-client relationship with SSB. The evidence will show that, in contrast to the express representations Fidelity made to Captiva regarding SSB's role, Fidelity covertly and improperly leveraged its relationship with SSB to assist Fidelity in trying to find a way to deny coverage. Had Captiva been afforded its rightful opportunity to know about the limited "defense" Fidelity had offered and if Captiva had known about Fidelity's abuse of the "defense" to find a way to deny coverage, Captiva would have rejected that defense. But Captiva did not know.

What Captiva did not know at the time was that Fidelity was improperly taking advantage of SSB's privileged access to information that had been afforded to SSB on account of its attorney-client relationship with Captiva. The evidence will show that Captiva provided certain information to SSB in the Lien litigation and that Fidelity, in turn, improperly obtained that

information from SSB and then used it to try and deny coverage.  Similarly, the evidence will show that SSB learned certain information from third parties on account of its privileged access to information as Captiva's defense counsel and that Fidelity, in turn, used its position of influence over SSB to extract that information and use it against Captiva in the dispute over coverage.  Nowhere is Fidelity's misuse of the defense to buttress a coverage denial more evident than a candent exchange between Fidelity (Mark Dickhute) and its coverage counsel (Jay Levitch).  Mr. Dickhute writes:

> About three weeks ago, I spoke with Martin [Blanchard, an attorney at SSB retained to defend Captiva in the Lien litigation] about the remaining lien claims in Captiva.  We agreed that he should proceed with Motion for Summary Judgment on the remaining lien claims.  My goal in that instruction: if it prompts cross-Motions, the Court will be forced to determine whether [NCB] (and Captiva) waived priority of their lien claims by their conduct in acting as the disbursing agent for the matter.  In other words, it will force the issue of priority to the surface, and may buttress our coverage denial in the matter.

Dickhute E-mail (available at Dkt. No. 257-10), at 1.  Or, in other words, Fidelity is misusing SSB and its "defense" to afford a basis to deny coverage.  Adding insult to injury, Fidelity then sought to conceal this misuse and interference with Captiva's defense by covering its trail, including instructing SSB to deny Captiva access to its very file.

Still not aware of the level of Fidelity's interference with the defense, Captiva complained to the Missouri Department of Insurance about the related limbo into which it was thrust by Fidelity's failure to convey a final coverage determination to Captiva, Fidelity impermissibly sought SSB's advice on Fidelity's response to that complaint.  Angered by Captiva's complaint as well as being frustrated by a dawning awareness that the loan's guarantors were not solvent, the evidence shows that Fidelity then limited the scope of the defense that SSB was authorized to provide to Captiva in the Lien litigation and refused to insure

over the Liens to facilitate a sale of the Project that would have likely negated the need for this lawsuit.

However, Fidelity did not tell Captiva *before* it instructed SSB that the "defense" it was authorized to provide would no longer include the customary aspects of any competent defense of a mechanic's lien, including an investigation of workmanship and whether the Liens reflected a "just and true" accounting of the services provided and the goods affixed to the Project.  As a result, Captiva was left with the prospect of being liable for inflated Liens as well as the costs of this deflated "defense" for which Fidelity had stated it would seek reimbursement upon a denial of Captiva's claim.  In addition to this evidence showing that Fidelity acted vexatiously and breached its duty to defend and indemnify Captiva, this evidence also shows that Fidelity tortuously interfered with Captiva's relationship with SSB.

On October 7, 2010, Fidelity initiated this lawsuit asserting four counts seeking declaratory judgments that there was no coverage for the Liens.  In September of 2012, judgment was entered in the Lien litigation in favor of five of the Lien claimants.  Fidelity appealed the judgment, but the appellate court affirmed the judgment of the trial court and the Missouri Supreme Court declined to review the case.  In July of 2014, Fidelity paid the Liens, and Fidelity provided Captiva with copies of the Lien claimant's satisfactions of judgment in December of 2014.  By letter dated May 19, *2015*, Fidelity suddenly withdrew the threat it had expressed in 2009 to seek reimbursement from Captiva of costs associated with the defense and adjudication of the Liens.   T. Archer/Captiva Letter, attached hereto as **Exhibit 1** and incorporated herein by reference, at 1.

## PROCEDURAL BACKGROUND

### *"Plaintiff" Fidelity's Claims*

None of the counts appearing in Fidelity's Complaint remain sufficiently viable for Fidelity to maintain its position as the plaintiff in this case.  All of Fidelity's remaining claim(s) in this lawsuit arise as defenses and are only reached after coverage is shown.  As such, Captiva should be the party to first present evidence to the jury.

Despite an internal decision to deny coverage, Fidelity nevertheless filed this lawsuit seeking judicial blessing for its determination that there was no coverage.  Specifically, the four counts appearing in Fidelity's Complaint seek declaratory judgments that:

- There is no coverage for the Liens because they related to work that pre-dates the Policy (Count 1);

- There is no coverage for the Liens because the pending disbursement endorsements ("PDE") do not affirmatively insure against the Liens (Counts 2 and 3); and

- Coverage for the Liens is excluded under sections 3(a) and/or 3(b) of the Policy Count 4).

*See* Complaint (Dkt. No. 1), Oct. 7, 2012, at ¶¶ 86-116.  Counts 1, 2 and 3 are not viable and, in any event, appear to have been abandoned because these counts have not been developed and there is insufficient evidence to support them.

Count 1 is not viable because it depends on Fidelity's "date of policy" argument that the Court rejected when it denied Fidelity's motion for summary judgment.[5]  Counts 2 and 3 are not viable because they both depend upon the legal effect of the PDEs that were issued.  Information obtained in discovery shows that an endorsement—which had to be part of the Policy in order for the PDEs to affect coverage—was not a part of the Policy and could wield no effect on coverage.

---

[5] In its motion for summary judgment, Fidelity argued that the Liens legally arose after the date of the Policy.  *See* Memo. (Dkt. No. 183), at 4-13.   In its Order denying Fidelity's motion, the Court rejected Fidelity's argument.  *See* Order (Dkt. No. 227), at 8-9.

*See* Footnote 1, *supra.* Fidelity subsequently did nothing to develop any evidence that would support Counts 2 and 3. As a result, Captiva believes that Counts 2 and 3 have been abandoned. That leaves Count 4. Although arguably viable, Count 4 was never viable as an affirmative claim because it only concerns an exclusion to coverage that is only logically reached as a defense *after* Captiva has shown that coverage exists in accordance with Count I of Captiva's Counterclaim. *See* Order (Dkt. No. 227), at 5 (citing *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 103 (Mo. App. 2004) (insurer bears the burden of providing the applicability of a coverage exclusion)).

Nevertheless, even the potential viability of Count 4 as an exclusion to coverage is doubtful in light of Fidelity's letter of May 19, 2015 (stating that Fidelity would not seek any recovery from Captiva for the costs associated with defense and adjudication of the Liens). Archer Ltr. (**Ex. 1**). As a result, it is unclear if the Court retains subject matter jurisdiction over Fidelity's Complaint. Standing alone, Count 4 only offers the prospect of Fidelity obtaining an advisory opinion on the applicability of a Policy exclusion 3(a) and/or 3(b) that will have no affirmative effect. This is made clear by the fact that if Fidelity were to "win" on Count 4, it will win no practical relief. The only practical relief that Fidelity could hope to obtain if it "won" on Count 4 would only arise if Captiva *first* prevailed on one or more of its Counterclaims. By trying to maintain its position as plaintiff in this case, Fidelity is seeking an unfair strategic advantage in which it is positioning itself to effectively take an end run around Captiva's claims in asking for a judicial determination that its denial and/or reservation of rights (whichever it is) was reasonable.

*Captiva's Counterclaims*

All of the counts appearing in Captiva's Counterclaim seek recovery related to the "loss or damage" that the Policy insures against.  In Count I, Captiva seeks a declaratory judgment that there is coverage under the Policy for the "loss or damage" caused by the Liens.  Count II seeks an award of actual damages for the "loss or damage" caused by Fidelity's breach of the obligation to defend under the Policy.  Count IV seeks an award of actual damages for the "loss or damage" caused by Fidelity's breach of the obligation to indemnify under the Policy.  Both Counts II and IV seek a statutory award for the misconduct underlying Fidelity's breaches of the Policy.  Finally, Count III seeks actual and punitive damages caused by Fidelity's tortious interference with Captiva's relationship with SSB (the counsel retained by Fidelity to defend Captiva in the Lien litigation).

*The Court's Orders*

At least two of the Court's Orders in this case will affect the presentation of the evidence at trial.  First, the Court recently granted Captiva's motion for sanctions, and the Court held that Captiva was entitled to the issuance of a permissive adverse inference.  *See generally*, Order (Dkt. No. 280), Jan. 7, 2015.  Subsequently, Fidelity has indicated that it intends to present evidence at trial in trying to convince the jury that the conduct sanctioned by the Court was committed innocently, and Fidelity has designated experts—both retained and on-retained—to testify on this topic.  Essentially, Fidelity seeks to re-litigate the motion for sanctions in trying to rebut the adverse inference instruction that the Court will issue to the jury.  This is not allowed under the applicable law.  When a court allows an adverse inference instruction to remedy discovery misconduct, "a complete retrial of the sanctions hearing during trial … [is] not permitted".  *See Process Controls Int'l, Inc. v. Emerson Process Mgm't*, No. 4:10CV645 CDP,

2011 WL 5006220, at * 8 (E.D. Mo. Oct. 20, 2011) (quotations omitted).  Whatever "limited opportunity [there is] to rebut the adverse inference instruction", that opportunity cannot include the mini-trial that Fidelity's designations envision.  *Id.*

Second, the parties filed cross motions for summary judgment, and although the Court denied both motions in 2013, it offered some guidance "regarding interpretation of the policy" in its order.  Order (Dkt. No. 227), Apr. 22, 2013, at 1.  Two of the guideposts afforded by the Court's Order deserve some attention before this matter proceeds to trial.  The first concerns what Captiva, with all due respect, believes to be an erroneous characterization of some of the damages incurred by Captiva as being "consequential" damages.  The second concerns the evidentiary effect of the Court's correct application of the law concerning the threshold requirement for presenting any evidence on the applicability of Policy exclusion 3(a).  These two issues will be the first two discussed below.

### DISCUSSION

## I.   THE POLICY AFFORDS COVERAGE FOR "LOSS OR DAMAGE" CAUSED BY THE LIENS.

In its Order on the summary judgment motions, the Court held that "[t]he loan policy provides coverage for mechanics' liens", but it stopped short of holding that the coverage afforded for the Liens included the specific damages caused by the Liens when Captiva could not sell or obtain financing to finish the Project—the marketability component of the "loss or damage" incurred by Captiva on account of the Liens.  Order (Dkt. No. 227), at 10 and generally at 5-10.  In passing, the Court characterized these losses and damages as "consequential" in nature and reserved judgment on the legal question of whether the Policy afforded coverage for such damages and on the factual question of whether Captiva's title was unmarketable.  *Id.* at 10.

Questions concerning the coverage afforded by a policy are, indeed, legal questions to be decided by the Court. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010); *Transit Cas. Co. in Receivership v. Certain Underwriters at Lloyd's of London*¸ 963 S.W.2d 392, 396 (Mo. App. 1998). However, the "loss or damage" caused by the Liens in making Captiva's title "unmarketab[le]" cannot be consequential damages because damages for "[un]marketability of the title" are expressly provided by the Policy. Policy (Dkt. No. 2-1), at 7. A more specific explanation is in order. The Policy identifies what the insured is being protected against: "loss or damage". Specifically, the Policy insures against "loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured *by reason of* [eight express occurrences]" that all trigger Fidelity's obligation to defend and indemnify the insured for the "loss or damage" that the happening of *any* of those eight occurrences have caused. *Id.* To illustrate: when any of those eight express occurrences happen, such as a "7. Lack of priority" *or* "3. Unmarketability of the title", the Policy provides coverage for the "loss or damage" that is "sustained or incurred by the insured *by reason of* [such express occurrences]". *See id.* Under the Policy, there is coverage for all of the "loss and damage" caused by the Liens, including the "loss of damage" incurred by Captiva on account of the Liens causing Captiva's title to not be marketable.

The point that the Policy simply makes is there is coverage for "loss or damage" caused by the specified occurrences. Yet, Fidelity has attempted to obscure that simple point by clouding the question of coverage with unwarranted complexity. Broken down, the central premise in the arguments Fidelity has made concerning coverage depend upon a distinction between so-called Insuring Provision No. 3 (loss of marketability) and Insuring Provision No. 7 (loss of priority). Fidelity's argument builds upon this utterly unsupported distinction in order to

try and support Fidelity's conclusion that the coverage afforded by Insuring Provision No. 7 is wholly different than what is afforded by all the other insuring provisions, including the third provision. As Fidelity would have it, all of the Policy's insuring provisions are retrospective, except for the "narrow exception" for prospective coverage found in Insuring Provision No. 7. *See, e.g.,* Memorandum in support of Fidelity's motion for summary judgment (Dkt. 183), at 15 n.3.

The distinction urged by Fidelity is unfounded and is neither supported by the Policy nor any case law. As illustrated above, the Policy provides coverage for "loss or damage" caused by specified events. The Policy does not provide a different mechanism for measuring "loss or damage" caused by one specified event over another specified event. The Policy provides coverage for "loss or damages", period. And as soon as the link is made between one of the eight specified triggers for coverage, Fidelity is obligated to afford coverage for the resulting "loss or damage". Similarly, case law provides no support for the novel distinction urged by Fidelity. The guidance that is provided by the case law refutes Fidelity's tortured reaching of the Policy. At best, Fidelity has located an ambiguous provision, and as the Court's Order of summary judgment pointed out, "[a]mbiguous language is construed against the insurer" and it favors coverage. *See* Order (Dkt. No. 227), at 5 (citing *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. 1993)). As such, there is coverage for the "loss or damage" caused by Captiva's title being unmarketable. While the Court ruled that the jury must decide the question of whether Captiva's title was unmarketable, there should be no question of whether the Policy affords coverage for "loss or damage" caused by Captiva's title not being marketable.

## II.   THERE IS NO EVIDENCE THAT COULD TRIGGER POLICY EXCLUSION 3(a) AS A MATTER OF LAW.

Fidelity has argued that coverage is excluded under Policy Exclusion 3(a) because Captiva's predecessor, National City Bank or NCB, caused the Liens to be filed (or, to use the language of the Policy, NCB "suffered" and "assumed" the Liens).  Fidelity has asserted that the applicability of Exclusion 3(a) depends upon the jury's resolution of disputed material facts, and Fidelity has previously identified what these "facts" are.  *See, e.g.,* Response (Dkt. 199), at 12-17 and also at 13 n.14.  Under the Court's Order and the applicable case law, none of this evidence is admissible as a matter of law on the issue of whether Policy Exclusion 3(a) could apply.

The Court's Order offered guidance on what sort of evidence could trigger Policy Exclusion 3(a).  Order (Dkt. No. 227), at 10-15.  As the Court correctly noted, "Missouri law strictly construes exclusionary clauses against the insurer", and the Court also similarly noted that "[t]he Eighth Circuit has held that the exclusion [Policy Exclusion 3(a)] is ambiguous and must be strictly construed against the insurer."  *Id.* at 11.   The Court went to instruct that "Exclusion 3(a) will apply if Fidelity can show 'intentional misconduct, breach of duty, or otherwise inequitable dealings' by National City Bank, or that recovery for individual lien claims would amount to an unwarranted windfall because National City Bank received the benefit for the work reflected in the liens without disbursing payment."  *Id*. at 14-15.

All of the "facts" identified by Fidelity in support of its claim that Policy Exclusion 3(a) applies relate to the supposed imprudent lending practices of NCB.  None of this evidence even approaches the evidentiary threshold established by the Court.  As admitted by Gregory Dawley[6] in his recent deposition, Fidelity does not have any evidence of the following: intentional misconduct by NCB; breach of duty by NCB; inequitable dealings by NCB; or NCB's

---

[6] Mr. Dawley is a former Fidelity claims handler who was responsible for managing Captiva's claims.

unwarranted windfall in obtaining the benefit of having work done but not disbursing the funds to pay for it.  *See* Deposition Transcript of G. Dawley, attached hereto as **Exhibit 2** and incorporated herein by reference, at 255-57 (no knowledge of evidence that could have implicated Policy Exclusion 3(a)); *see also* Deposition Transcript of B. Nielsen,[7] attached hereto as **Exhibit 3** and incorporated herein by reference, at 102-03 (same).   As a result, there is no need to waste the jury's time trying to figure out what NCB did or did not do in making the underlying loans or the associated disbursement of funds.   Such evidence, even if true, is inadmissible because it is pointless and not relevant to any issue that the jury will find.  To allow the admission of such evidence would needlessly confuse the jury and would be prejudicial to Captiva.

### III.   THE LEGAL AND FACTUAL BASIS FOR CAPTIVA'S CLAIMS.

The existence of coverage under the Policy is a question of law for the Court to decide. *Burns*, 303 S.W.3d at 509; *Transit Cas.*¸ 963 S.W.2d at 396 (Mo. App. 1998).   An insurance policy is a contract and the interpretation of that policy is governed by the canons of contract construction.  *Id.*; *Hartford Accident & Idem. Co. v. Farmington Auction, Inc.*, 356 S.W.2d 512, 518–19 (Mo. App. 1962).  Title insurance exists to protect the priority of the insured's interest in the property.   Any exclusionary language "is be construed so as to afford coverage" and is construed against the insurer subject to the insurer carrying its burden of proof in proving the applicability of a policy exclusion.  *Am. Family Mut. Ins. Co. v. Brown*, 657 S.W.2d 273, 275 (Mo. Ct. App. 1983); *see also Am. Family Mut. Insur. Co. v. St. Clair*, 295 S.W.3d 586, 592 (Mo. Ct. App. 2009); *Graue v. Mo. Property Ins. Placement Facility*, 847 S.W.2d 779, 785 (Mo. 1993).  In the event the Court finds an ambiguity, the "insured [is] entitled to a resolution of that

---

[7] Mr. Nielsen is Fidelity's retained expert on coverage.

ambiguity consistent with their objective and reasonable expectations as to what coverage would be provided." *Burns v. Smith*, 303 S.W.3d 505, 512 (Mo. 2010).

An evidentiary issue with respect to Captiva's claims concerns the fact that Captiva did not utterly reject the defense offered by Fidelity.  Fidelity may seek to elicit testimony regarding this subject.  Importantly, an insured cannot reject a defense offered by an insurer that is subject to a reservation of rights when the insurer misrepresents the nature of the defense being offered.  Pursuant to Missouri law and the Policy, upon receiving notice of Captiva's claim Fidelity had three options: (1) accept coverage and defend; (2) defend with a reservation of rights; or (3) deny.  *Whitehead v. Lakeside Hosp. Ass'n*, 844 S.W.2d 475, 477, 481 (Mo. App. 1992); *see also State ex rel. Rimco, Inc. v. Dowd*, 858 S.W.2d 307, 308 (Mo. App. 1993).  By requiring a full defense when an insurer defends subject to a reservation of rights, only then is the insured afforded a meaningful right to reject.  Otherwise what can happen is what happened here: the insured is left defenseless.  Captiva's purported right to reject the defense offered by Fidelity was meaningless because Fidelity did not fully defend and never told Captiva that the defense was limited in time to allow Captiva to defend itself.

Fidelity would have this Court believe that it chose the second option, but Fidelity did none of the above (what Fidelity really did was choose option 3 but told Captiva it was going with option 2).  As noted in the Court's Order on the summary judgment motions, an insurer's privilege to defend subject to a reservation of rights depends upon (1) giving a full defense and (2) "fully notif[ying] [the] insured".  *See* Order (Dkt. No. 227), at 16.  The evidence will show that Fidelity did neither.  It did not provide the customary and competent defense in defending Captiva in the Lien litigation, and it never properly disclosed this limited "defense" to Captiva.  The decision of an insured in not rejecting a defense offered by an insurer that is offered subject

to a reservation may be relevant when the insurer is upfront with its insured and does not limit the defense being afforded.  However, Captiva's decision not to reject the defense that Fidelity offered is not relevant where Fidelity did not provide a *full* defense and did not *fully* apprise of the sort of defense being afforded.  The result is that Captiva was deprived of its rightful opportunity to reject the "defense" offered by Fidelity.

A.   FIDELITY BREACHED THE POLICY WHEN IT FAILED TO DEFEND CAPTIVA IN THE LIEN LITIGATION.

"The duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependant [sic] on the probable liability to pay based on the facts ascertained through trial.  The duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint.  If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.,* 989 S.W.2d 168, 170–71 (Mo. 1999) (internal citations omitted); *see also Sawyer v. Bi-State Dev. Agency,* 237 S.W.3d 617, 621 (Mo. Ct. App. 2007) (internal citations omitted) ("The duty to defend is broader than the duty to indemnify.  An insurer may have a duty to defend claims falling within the policy even if it may not ultimately be obligated to indemnify the insured."); *Stark Liquidation Co. v. Florists' Mut. Ins. Co.,* 243 S.W.3d 385, 392 (Mo. Ct. App. 2007) (internal citations omitted) ("The insurer has a duty to defend if the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage.  An insurer, however, may not merely rest upon the allegations contained within the petition.  Rather it must also consider the petition in light of facts it knew or could have reasonably ascertained.  To extricate itself from a duty to defend the insured, the insurance company must prove that there is *no possibility* of coverage.").

Here, the Policy clearly and unambiguously provided coverage for the "loss or damage" caused by the Lien litigation.  Fidelity breached the Policy when it limited the defense it provided to Captiva.  The evidence will show that Fidelity went behind Captiva's back and limited the scope of its representation despite making express assurance to Captiva that SSB would be providing a full and vigorous defense. At the direction of Fidelity, SSB did not provide a competent defense.   Behind Captiva's back, Fidelity instructed SSB to take actions that resulted in a compromised investigation of the validity and amounts of the Liens (as discussed above), including a failure to act on information Captiva provided to SSB showing the Liens were inflated despite Captiva's presentation of compelling evidence of the need to retain an expert in defeating the Liens.  The evidence will show that Fidelity instructed SSB not to follow up on the information provided by Captiva to diminish the Lien amounts and to refuse to provide additional investigatory assistance, such as the retention of an expert, to prove the Liens were overstated.  In sum, the evidence will show that Fidelity breached the Policy by failing to defend Captiva against the Liens.

### B.    FIDELITY BREACHED THE POLICY WHEN IT FAILED TO INDEMNIFY CAPTIVA IN THE LIEN LITIGATION.

The evidence will show that Fidelity breached the policy by failing to acknowledge coverage and to indemnify Captiva against its "loss or damage", including that occasioned by unmarketability of the property as a result of the Liens.   The Policy clearly insured the marketability of Captiva's title.  As a result of the filing of the Liens, the evidence will show that Captiva could neither sell the property nor obtain a loan to complete the Project and prevent the weather from further damaging the unfinished structures.  The evidence will show that Fidelity is liable to Captiva for breaching the Policy and not affording coverage by not taking needed steps to maintain the marketability of Captiva's title.   The evidence will also show that Fidelity did

not indemnify Captiva for costs associated with maintaining and protecting the Property and did not indemnify Captiva for the costs associated with remediating the property damage that was incurred since Captiva's interest in the Project has damaged and impaired by the Liens.

### C. FIDELITY TORTIOUSLY INTERFERED WITH CAPTIVA'S ATTORNEY-CLIENT RELATIONSHIP WITH SSB.

The evidence will show that Captiva possessed a fiduciary relationship with SSB and a valid business expectancy concerning the service SSB was rendering; Fidelity knew of this relationship; Fidelity intentionally interfered with Captiva's relationship with SSB and induced SSB to breach its fiduciary duties to Captiva; and Fidelity's actions were without justification. *See Kantel Communications v. Casey*, 865 S.W.2d 685, 690 (Mo. App. 1993). As a result, the evidence will show that Captiva has been damaged as a result of Fidelity's tortious conduct, and the evidence will show that punitive damages are justified in order to punish Fidelity and deter similar misconduct.

Specifically, the evidence will show that Fidelity represented to Captiva that SSB would be Captiva's counsel and would owe to Captiva all of the attendant fiduciary duties, including the attorney-client privilege. Instead, the evidence will show that Fidelity treated SSB as its attorney. Fidelity enlisted the services of SSB to take advantage of the special access SSB had to information on account of being Captiva's defense counsel. Fidelity then used SSB's special access to obtain information that would bolster a denial of coverage (e.g., using information obtained in SSB's interviews to support its argument that NCB "suffered" and "assumed" the Liens). Additionally, Fidelity used its position as the entity paying SSB's bills (at least until Fidelity demanded reimbursement from Captiva, as it told Captiva it would be entitled to do) to cause SSB to file motions that were primarily designed not to defend Captiva but to afford a basis for denying coverage (e.g., in consultation with coverage counsel, Fidelity directs SSB to

file motions for summary judgment that could ostensibly be seen as being part of a "defense" strategy but were really part of Fidelity's scheme to deny coverage, *see* **Ex. 1** hereto).

Had Captiva known how Fidelity was interfering with Captiva counsel, Captiva would have immediately rejected the "defense".  Instead, Fidelity hid its misconduct from Captiva and repeatedly assured Captiva that coverage was "likely".  When Captiva sought access to its file that might, in turn, afford it some basis for learning of Fidelity's misconduct, Fidelity instructed SSB not to provide Captiva with its complete file.

In sum, the evidence will show that Fidelity represented to Captiva that a coverage analysis would only be performed by counsel who was separate from SSB.  However, the evidence will show that Fidelity used SSB to bolster Fidelity's decision to deny coverage and to use the foil of "defending" as a means to conduct a coverage investigation.  The coverage issues on which Fidelity enlisted SSB's services included using SSB to adduce information that might afford Fidelity with a basis to deny or otherwise restrict coverage and using SSB to try and defeat Captiva's means of ascertaining Fideltiy's true intent, including consulting with SSB on responding to a complaint that Captiva filed with the Missouri Department of Insurance and instructing SSB to deny Captiva's request to review its file.  The evidence will show that Fidelity tortuously interfered with representation and merits an award of damages, including an award of punitive damages.

### D.    FIDELITY'S FAILURE TO AFFORD COVERAGE WAS VEXATIOUS.

Section 375.420 of Missouri Revised Statute authorizes a jury's award of statutory penalties, interest and attorneys' fees where an insurer treats its insured vexatiously.  *See Smith v. AF&L Ins. Co.*, 147 S.W.3d 767, 778 (Mo. App. 2004).  The presence of a litigable issue does not preclude imposition of statutory penalties/fees where there is evidence that the insurer's attitude was "vexatious or recalcitrant."  *Id.*  In dealing with Captiva's claim, Fidelity raised

defenses that were baseless under Fidelity's own guidelines and the law.  The evidence will show that Fidelity had insufficient factual bases to assert these defenses and acted unreasonably in advancing these spurious claims.  In denying Captiva's claim, Fidelity ignored well-established Missouri law and the facts of this case, advancing theories and defenses that were without merit. As such, Fidelity should be liable for penalties and attorneys' fees pursuant to Mo. Rev. Stat. § 375.420.

## CONCLUSION

Captiva intends to ask the jury to award Captiva its losses and to award Captiva interest, punitive damages, penalties, and attorneys' fees and costs.  As set forth above, such an award is supported by the facts of this case and applicable law.

Respectfully submitted,

**LEWIS RICE LLC**

By:     /s/ Steven D. Hall
       Richard A. Wunderlich, #27979
       John M. Hessel, # 26408MO
       Steven D. Hall, #56762MO
       600 Washington Ave., Suite 2500
       St. Louis, MO  63101
       Telephone:  314-444-7600
       Facsimile:  314-612-1308
       rwunderlich@lewisrice.com
       jhessel@lewisrice.com
       shall@lewisrice.com

*Counsel for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing was served the 15th day of June, 2015 via the

Court's ECF system upon all counsel of record.


/s/ Steven D. Hall_____